UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| U.S. FOODSERVICE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ARTHUR TSEBETZIS, STEVEN POSIN, JOHN J. O'HARA, JEFFREY E. GROSS, and AGAR SUPPLY, INC.,<br><br>Defendants. | Civil Action No. _____ |

**VERIFIED COMPLAINT**

Plaintiff U.S. Foodservice, Inc. ("**USF**") alleges as follows for its complaint against Defendants Arthur Tsebetzis, Steven Posin, John J. O'Hara, and Jeffrey E. Gross (collectively the "**Former Employee Defendants**") and Agar Supply, Inc. ("**Agar**").

**NATURE OF THE ACTION**

1.  USF seeks injunctive relief and damages against the Former Employee Defendants and Agar, a direct competitor of USF in the foodservice business, for their collective violations of and tortious interference with non-solicitation and non-disclosure agreements and customer relationships. USF seeks injunctive relief to prevent the irreparable harm that will result unless the Former Employee Defendants and Agar are prevented from engaging in further illegal conduct.

NY55/330704.4

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction of the matters complained herein pursuant to 28 U.S.C. § 1332, and venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) in the District of Massachusetts because USF has an office in this District located at 201 Beacham Street, Everett, MA 02149, each of the Former Employee Defendants traveled to and conducted business in this District, USF will suffer injury in this District, and each of the acts alleged herein occurred within the territorial limits of this District under the authority of the laws of the Commonwealth of Massachusetts and involve a matter in controversy exceeding, exclusive of disbursements and costs, $75,000.00.

3. Pursuant to Mass. Gen. Laws c. 223A, §3, this Court may exercise personal jurisdiction over Steven Posin ("**Posin**"), a New Hampshire resident, because he has acted directly or by his agents as to a cause of action in law or equity arising from his transacting any business in Massachusetts, contracting to supply services or things in Massachusetts, causing tortious injury by an act or omission in Massachusetts, and/or causing tortious injury in Massachusetts by an act or omission outside Massachusetts since Posin regularly conducts or solicits business or engages in a persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered in Massachusetts. Pursuant to Mass. Gen. Laws c. 223A, §2, this Court has personal jurisdiction over the remaining Defendants because they are present in the state.

NY55/330704.4

## THE PARTIES

4.     Plaintiff USF is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 9755 Patuxent Woods Drive, Columbia, MD 21046. At all pertinent times, USF has been authorized to do business in the Commonwealth of Massachusetts and its office has been located at 201 Beacham Street, Everett, MA 02149. USF is a broadline foodservice distributor with operations throughout the United States.

5.     On information and belief, Defendant Arthur Tsebetzis ("**Tsebetzis**") is a citizen of the Commonwealth of Massachusetts who resides at 66 Bridge Street, Medfield, MA. Until April 11, 2003, when he voluntarily resigned to work for Agar, Tsebetzis was at various times the Senior Vice President of Sales and the Division President supervising the Territory Managers who service USF's customers in the Massachusetts market.

6.     On information and belief, Defendant Posin ("**Posin**") is a citizen of the state of New Hampshire who resides at 162 Millville Street, Salem, NH 03079. Until July 15, 2002, when he voluntarily resigned, Posin was the Vice President of National Accounts supervising the Territory Managers who service USF's customers in the Massachusetts market.

7.     On information and belief, Defendant John J. O'Hara ("**O'Hara**") is a citizen of the Commonwealth of Massachusetts who resides at 18 Sunnybank Road, West

Roxbury, MA. Until May 24, 2003, when he voluntarily resigned to work for Agar, O'Hara was a Territory Manager serving USF's customers in the Massachusetts market.

8. On information and belief, Defendant Jeffrey E. Gross ("**Gross**") is a citizen of the Commonwealth of Massachusetts who resides at 54 Outlook Road, Marshfield, MA 02050. Until September 5, 2003, when he voluntarily resigned to work for Agar, Gross was a Territory Manager serving USF's customers in the Massachusetts market.

9. On information and belief, Defendant Agar is a Massachusetts corporation with its principal place of business at Myles Standish Industrial Park, 225 John Hancock Road, Taunton, MA 02780.

## Defendants' Wrongful Conduct

### A. Nature of USF's Business

10. USF is in the business of assisting its customers to obtain the combinations of food products they need (both by variety and brand) at a competitive price on a timely delivery schedule. USF's customers are restaurants and other establishments that serve food such as schools, offices, and hospitals.

11. To maintain a competitive advantage in a highly competitive industry, USF has developed business relationships with particular customers and has developed confidential information and strategies to service their needs. Many of the customers the Former Employee Defendants served in the Massachusetts market had been with USF for over ten years.

-4-

NY55/330704.4

### B. Territory Managers

12.     USF services its customers through a network of sales representatives, known as Territory Managers. These Territory Managers are USF's most direct link to its actual and potential customers. USF pays its Territory Managers to spend most of their time meeting with customers to assess their needs, determine how USF can best satisfy those needs, and work to enhance the relationship and goodwill between the customers and USF. The Territory Managers present the "face" of USF to USF's customers.

13.     Defendants O'Hara and Gross were USF Territory Managers when they resigned from USF to join Agar. O'Hara and Gross began their tenure with USF on September 28, 1987, and March 26, 2001, respectively.

14.     The USF customer relationships, customer goodwill, confidential, valuable and competitively sensitive information that USF's Territory Managers use and develop in connection with serving USF's customers are the lifeblood of USF's business.

### C. USF Executives

15.     USF pays its executives to oversee and direct its Territory Managers to effectively serve USF's customers and to ensure that the Territory Managers achieve their annual goals. USF Executives have access to confidential, valuable, and competitively sensitive information that they use both directly and indirectly to facilitate and forge the

development of goodwill between the customers and the Territory Managers on USF's behalf.

16. The USF Executives oversee and manage the Territory Managers in their respective divisions, which includes, among other things, developing new business, maintaining current business, and developing strong relationships with customers through regular, direct contact. They had comprehensive and deep knowledge of USF's efforts to service its customers and its plans to keep its accounts and develop further relationships with them. They were charged with learning and developing USF's market and customer strategies for the entire market and learning about specific customers and their needs. They worked with and supervised Territory Managers to develop customer relationships and strategies for serving the customers.

17. USF employed both Defendants Tsebetzis and Posin for approximately thirteen years, and both Tsebetzis and Posin were USF Executives when they voluntarily resigned from USF. Defendant Arthur Tsebetzis was USF's Senior Vice President of Sales in charge of all USF sales for the Boston-Everett area. Defendant Steven Posin was USF's Vice President of National Accounts for the Boston-Everett area.

18. Defendants Tsebetzis and Posin had access to confidential information that they acquired and developed in the day-to-day supervision of the Territory Managers as well as in the direct contact they had with certain USF customers to ensure that the Territory Managers were meeting the needs of those USF customers.

### D. Building Customer Relationships and Determining Customer Tastes and Preferences

19. USF provided each of the Former Employee Defendants with lists of customers, introductions to existing customers, customer prospects and assessments of which customers and prospects were likely to produce the most business. Most, if not all, of the customers the Former Employee Defendants served for USF were USF customers for many years before USF assigned the Former Employee Defendants to service their accounts. When the Former Employee Defendants resigned, many of the customers they served had been USF customers for ten years or more. Others were newer customers with which USF, through its Territory Managers, was in the process of building continuing customer relations.

20. USF also provided the Former Employee Defendants with training about USF's procedures and approaches for attracting, satisfying, and servicing customers. USF assisted its Executives and Territory Managers, including the Former Employee Defendants, in cultivating customers by, among other things, offering business support, guidance, sales training, assistance in making cold calls, assistance in solving problems, and guidance on pricing and product offerings.

21. While at USF, the Former Employee Defendants used and helped develop confidential, competitively sensitive and valuable information about customer needs, preferences, and requirements, and worked with USF to determine the ways to best satisfy those needs, preferences, and requirements. Among other things, the Former Employee Defendants were privy to and helped develop confidential USF Customer

Order Guides showing, by brand, volume, quality, and size, the products each customer typically ordered or requested and the specific prices USF offered each specific customer for each product – sometimes hundreds of products. The Former Employee Defendants were privy to and helped negotiate long-term contracts with some of USF's customers. The Former Employee Defendants were also privy to customer marketing strategies and customer credit histories. All of this composite information provides a valuable roadmap for serving each customer.

22. The Former Employee Defendants' knowledge of customer needs and USF's confidential plans and strategies to satisfy those needs was developed over time as the product of interviews with customers, observation of customer preferences, and coordination with other USF personnel and USF policies and business strategies. In addition, the Former Employee Defendants were privy to USF's confidential and competitively valuable information relating to its profitability and profit margins with respect to various customers, products, and product lines.

23. USF does not share with any of its competitors any information about how it serves its customers. Rather, USF provides this valuable and confidential information only to the USF employees who need to know the information to service the accounts. Thus, USF uses this information to expand customer relationships and build goodwill.

24. During their employment with USF, the Former Employee Defendants enjoyed good relationships and cultivated substantial goodwill with a number of USF's customers. Customer relationships generally are not built overnight in the foodservice

industry; they are cultivated over time and at great expense. These relationships are highly susceptible to diversion and erosion when USF Executives or Territory Managers leave the company and compete for business from the same customers that they had served for USF by, for example, trading upon the customer goodwill and relationships that they developed at USF's expense.

25. The accounts that the Former Employee Defendants served for USF collectively generated millions of dollars in sales for USF and were expected to increase in the future.

### E. The Former Employee Defendants' Contracts

26. Recognizing that its Executives and Territory Managers are USF's direct link to customers, and that they possess and use USF's valuable and confidential information, USF (and its predecessors and affiliates) requires its Executives and Territory Managers enter into agreements which provide, among other things, that for a period of time after they leave the employ of USF, they will not directly or indirectly, contact, solicit or sell to specifically those customers or prospective customers that they served or learned confidential information about while employed by USF, and that they will not recruit or help recruit any employees of USF to work for a competitor.

27. All of the Former Employee Defendants entered into such agreements with USF in consideration of continued employment and other benefits. The most recent agreements are attached. *See* Agreement of Arthur Tsebetzis, dated February 10, 2003, a true and correct copy is attached hereto as **Exhibit 1**; Agreement of Steven Posin, dated

February 12, 2002, a true and correct copy is attached hereto as **Exhibit 2**; Agreement of John J. O'Hara, dated January 5, 2003, a true and correct copy is attached hereto as **Exhibit 3**; Agreement of Jeffrey E. Gross, dated January 8, 2003, a true and correct copy is attached hereto as **Exhibit 4**.

28.   Pursuant to the agreements, the Former Employee Defendants agreed that for a period of one year after leaving USF they would not directly or indirectly contact, solicit or service those customers or prospective customers with whom they had contact in the prior eighteen months or about whom they had confidential information while employed by USF. *See* Ex. 1 at ¶ 3; Ex. 2 at ¶ 2(b); Ex. 3 at ¶ 6; Ex. 4 at ¶ 6. Each of the Former Employee Defendants has violated their non-solicitation agreements.

29.   Defendants Tsebetzis and Posin also agreed that if they supervised employees who had contact with or confidential information about USF customers, they would be "considered to have had contact with all of the Customers with which the Supervised Employees have had contact, and therefore shall be bound by this Section and shall not contact, solicit, sell to or deal with any such Customers." *See* Ex. 1 at ¶ 3(a); Ex. 2 at ¶ 2(b). Defendants Tsebetzis and Posin have violated this provision.

30.   The Former Employee Defendants also agreed that for a period of one year after they left the employ of USF, they would not recruit or help recruit any employees of USF to work for a competitor. *See* Ex. 1 at ¶ 5; Ex. 2 at ¶ 2(d); Ex. 3 at ¶ 7; Ex. 4 at ¶ 7. Defendants Tsebetzis and Gross have violated their non-solicitation agreements by recruiting or attempting to recruit USF employees to work for Agar.

31.     Although his agreement expired on July 15, 2003, as set forth below, Posin breached his non-solicitation obligations during the term of his contract. In addition, upon information and belief, Posin knows that Tsebetzis, O'Hara and Gross are currently bound by agreements that contain non-solicitation and confidentiality obligations and Posin knowingly encouraged and assisted Tsebetzis, O'Hara and Gross to breach their non-solicitation and confidentiality agreements to divert USF customers and USF employees to Agar.

32.     In addition, the Former Employee Defendants agreed not to use or disclose, whether during or after their employment, confidential information that USF uses in its business. Examples of such information include:

- The Former Employee Defendants' or USF's customer routes, books, and customer cards;

- The route list of any USF Territory Manager;

- USF's sales and delivery schedules;

- Customer lists;

- USF's credit terms and information, including payment records and any of USF's financial information; and

- USF's promotional programs, pricing policies, lists and sales allowances and discounts, and sales totals of various territories.

*See* Ex. 1 at ¶¶ 1(e), 2; Ex. 2 at ¶¶ 2(a), 2(c); Ex. 3 at ¶¶ 1, 4; Ex. 4 at ¶¶ 1, 4.

33.     Finally, the Former Employee Defendants agreed that upon leaving the employ of USF, each would return to USF all confidential information in any media and all copies thereof. *See id.*

-11-

**F. The Former Employee Defendants' Post-Resignation Wrongful Activities.**

34. Both before and after the Former Employee Defendants voluntarily resigned, USF reminded each of them that they had signed agreements with USF that, among other things, obligated them to safeguard USF's confidential information and not to interfere with USF's business relationships for one year. USF stressed that it takes these matters very seriously and that infractions of these agreements would not be tolerated.

35. Following their voluntary resignations, USF wrote to the Former Employee Defendants to remind them of their contractual obligations to USF, and enclosed copies of their agreements. True and correct copies of those letters are attached hereto collectively as **Exhibit 5**.

36. On information and belief, Tsebetzis removed confidential, valuable and competitively sensitive information when he resigned. When conducting a post-resignation inventory investigation, USF discovered that Tsebetzis' credenza was empty and all of his files were missing.

37. In violation of their agreements, the Former Employee Defendants did not return any Customer Order Guides or other printouts of confidential information. Further, Tsebetzis failed to return any files or other confidential information that had been in his credenza.

NY55/330704.4

### G. The Former Employee Defendants' Impermissible Contacts

38.  Within days of each other, Tsebetzis, Posin and O'Hara commenced employment at Agar in May of 2003. Shortly thereafter, Tsebetzis, Posin and O'Hara violated their agreements by soliciting and serving Agar customers with whom they had had direct or indirect responsibility while employed by USF and customers about whom they learned and developed confidential information while employed by USF.

39.  Upon information and belief, Tsebetzis and Posin together coordinated and developed a systematic strategy to share and use USF's confidential information to contact USF customers with whom Tsebetzis or Posin had direct or indirect contact to develop business on Agar's behalf.

40.  For example, on or about May 27, 2003, Tsebetzis and Posin arranged a meeting at the Commonwealth of Massachusetts Department of Corrections ("DOC") to solicit its business on Agar's behalf. USF has served the DOC for the past ten years. Posin serviced the DOC account while employed by USF, and is intimately familiar with the terms of the contract between USF and DOC, including DOC's bid process, preferred product line, and pricing. Upon information and belief, Posin shared this confidential information with Tsebetzis and together they used USF's confidential information to solicit DOC's business on Agar's behalf.

41.  During this same time frame, and in further violation of his agreement, Tsebetzis contacted O'Hara while he was still employed by USF as a Territory Manager

to recruit him to work for Agar. Upon information and belief, based on Tsebetzis' recruiting efforts in violation of his agreement with USF, O'Hara resigned from USF on May 24, 2003, and commenced employment with Agar on May 27, 2003 – just a few short weeks after Tsebetzis did.

42. Shortly after O'Hara joined Agar, he solicited and served Agar customers that he had serviced on behalf of USF, customers with whom he had had significant contact while at USF, and customers about whom he had learned confidential information while at USF. For example, in or about June 2003, O'Hara called on Buffs Pub, an account that he serviced on behalf of USF, and with which he had significant routine contact while employed by USF.

43. On or about July 15, 2003, in furtherance of their plan to develop business for Agar by using USF's confidential information, Tsebetzis and Posin held a "mini food show" at Agar for Corporate Chef, a long-time USF customer with whom both Tsebetzis and Posin had significant contact and responsibility while at USF and for whom both Tsebetzis and Posin had drafted a contract (while at USF) on terms favorable to Corporate Chef. A foodservice company holds a food show to solicit customers and entice them to commit to long-term purchasing arrangements by inviting prospective customers, such as Corporate Chef, and vendors to the food show. On December 18, 2003, Corporate Chef gave notice to USF that they were canceling their contract. Upon information and belief, Tsebetzis and Posin used their knowledge of USF's confidential

information and contract with Corporate Chef to solicit and undercut USF's pricing to successfully divert Corporate Chef's business from USF.

44. Tsebetzis and Posin also contacted Boston College, a 15-year USF account, to solicit Boston College's business and to make a formal bid for a contract with Boston College. Tsebetzis closely supervised the Boston College account while he was employed by USF and he possessed confidential information regarding the terms of the Boston College contract with USF, including the bid process, preferred product line and pricing. Tsebetzis closely monitored the tri-monthly bids that USF submitted on the Boston College contract. Upon information and belief, Tsebetzis shared this confidential information with Posin who jointly used the confidential information to attempt to divert Boston College's business to Agar.

45. In or about October 2003, Tsebetzis contacted Michael Contarino, a USF Territory Manager, to recruit him to work for Agar. Tsebetzis and Contarino, who were close friends for over 25 years, discussed the terms of Contarino's potential employment at Agar, including salary and a start-date of February 1, 2004. Contarino is still employed by USF, and Kelly's Roast Beef, a USF customer for over ten years, is his principal client. USF has now learned that, through the efforts of Tsebetzis and Posin, Kelly's Roast Beef may switch distribution services from USF to Agar effective February 1, 2004, which also happens to be the start-date suggested by Tsebetzis. On information and belief, Tsebetzis used the confidential information he acquired at USF about Kelly's

Roast Beef (directly through his supervisory role over Contarino and the Kelly's Roast Beef account) to service the account on Agar's behalf.

46. On or about November 19, 2003, Defendant Gross, another former USF Territory Manager now employed by Agar, contacted Chris Daly, a USF Territory Manager, to recruit him to work with Agar in violation of the non-solicitation of USF employees in his agreement. Daly is still employed with USF and did not engage in further discussions with Gross about employment at Agar.

47. During the months of November and December of 2003, in further violation of his agreement, Defendant O'Hara called on Hanscom Air Force Base and Bella Luna, accounts he serviced on behalf of USF, and with which he had significant routine contact while employed by USF.

48. Following the departures of the Former Employee Defendants, USF has lost sales or expects to lose sales to Agar from Corporate Chef, Hanscom Air Force Base, and Kelly's Roast Beef, all long-standing customers of USF, which, on information and belief, had not purchased in any material amounts from Agar in at least the five years preceding Agar's hiring of the Former Employee Defendants. USF has already lost the Corporate Chef account and is in jeopardy of losing the Kelly's Roast Beef account to Agar.

49. On information and belief, the Former Employee Defendants have solicited the USF customers that they are contractually prohibited from soliciting or

NY55/330704.4

servicing. They have done this while accompanied by other Agar sales representatives and in the process have attempted to divert USF's goodwill in those customers to Agar and to other Agar Sales representatives. On information and belief, the Former Employee Defendants have also conveyed confidential information to Agar to use in soliciting these customers.

50. USF has written to Agar protesting these violations, but Agar has not brought them to a stop. True and correct copies of USF's letters to Agar are attached as **Exhibit 6**.

51. As a result of these and other numerous wrongful acts of the Former Employee Defendants and Agar, they have already diverted business from USF customers to Agar. While the amount of that lost business is not presently ascertainable, it is expected to increase. Further, without the acts complained of, the business from those accounts would have been reasonably expected to increase and remain with USF.

52. By their actions, the Former Employee Defendants have put at Agar's disposal the customer relationships, goodwill, and confidential information USF paid them to develop, and have used their intimate knowledge of USF's confidential customer information, pricing policies and other strategies for selecting and serving customers on Agar's behalf. Thus, the Former Employee Defendants and Agar have not had to invest the time that would otherwise be required – time that USF spent – to learn customer needs, their preferred mix of products, their preferred pricing, their delivery terms, or countless other important pieces of valuable information.

53.     Nor do the Former Employee Defendants, or their new employer, Agar, have to spend time trying to find out what the competition is offering to their former customers. They know because they were Agar's competition.

54.     These actions leave USF's customer base under attack by former USF Territory Managers and Executives who are using USF's own confidential information against USF. In fact, on information and belief, the Former Employee Defendants and Agar are employing a strategy to use USF's confidential information to improperly solicit USF's customers. This strategy includes the improper recruitment of USF employees who already formed the important client relationships with the USF customers and serviced those USF customers' accounts.

### H. Agar's Wrongful Activities

55.     Agar has been the knowing and welcoming beneficiary of the business the Former Employee Defendants have diverted to Agar in breach of their agreements, and indeed orchestrated their scheme to do so.

56.     Agar was fully aware of the contractual prohibitions on the Former Employee Defendants' post-employment activity. USF wrote to each of the Former Employee Defendants reminding them of their contractual obligations. *See* Ex. 5. In addition, USF sent letters directly to Agar asking Agar to direct the employees to honor their agreements. *See* Ex. 6.

57. Now that the Former Employee Defendants have diverted USF's customers to Agar in violation of their agreements, even if the Former Employee Defendants were to stop serving those customers, the harm to USF – and the improper windfall to Agar – would remain.

58. Upon information and belief, after using its existing personnel to attempt to gain the business of many of USF's long-standing customers and failing to do so, Agar has recruited USF's top performers by offering USF's employees guaranteed compensation packages which far exceed the market range. Guarantees are generally only profitable to a new employer if the sales associates bring existing business with them. On information and belief, Agar is paying for, among other things, the goodwill of the customers the USF sales personnel served or had contact with and for confidential information that USF has developed over time, including its customer and marketing strategies.

59. Agar has engaged in a course of repeated encouragement in aiding of the Former Employee Defendants and other former USF employees to disregard their contractual obligations to USF and its subsidiaries, and to misappropriate USF's confidential information for use in soliciting customers of USF and its subsidiaries.

60. For example, Agar hired three former USF Territory Managers, Ray Zakarian, George Hill, and Charles Oertel, each of whom, in violation of their non-solicitation and confidentiality agreements with USF, knowingly and intentionally solicited and served for Agar certain customers they had previously served on behalf of

USF. Agar knowingly accepted the business these former USF employees have diverted to Agar in breach of their agreements and has retained the gains from these activities even after USF advised Agar of the violations.

61.   Agar has hired a number of key USF employees. By doing so, Agar has increased the likelihood of misuse or disclosure of USF's confidential information. Some of these former USF employees have violated their agreements with USF despite letters to Agar and the employees asking them to stop. Although USF has communicated with Agar's corporate headquarters on numerous occasions by letter over the course of the last few months, allowing them a chance to remedy the situation, the violations have not ceased.

62.   Agar either cannot, or will not, require its employees to honor their agreements with USF. What Agar apparently is prepared to do, however, is to retain the fruits of those violations.

63.   USF's repeated demand letters to the Former Employee Defendants and Agar have not had any effect on curbing Agar's wrongful actions.

64.   These acts have caused and will continue to cause USF substantial, immediate and irreparable injury and damages for which it lacks an adequate remedy at law.