UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

U.S. FOODSERVICE, INC.,

Plaintiff,

v.

Civil Action No. 03-12603-RCL

ARTHUR TSEBETZIS, STEVEN POSIN,
JOHN J. O'HARA, JEFFREY E. GROSS, and
AGAR SUPPLY, INC.,

Defendants.

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff U.S. Foodservice, Inc. ("USF") submits this memorandum of law in support of

its motion for a preliminary injunction against Defendants Arthur Tsebetzis, Steven Posin, John

J. O'Hara, Jeffrey E. Gross (collectively the "Former Employee Defendants") and Agar Supply,

Inc. ("Agar").

### PRELIMINARY STATEMENT

USF faces a threat of immediate and irreparable injury. The Former Employee

Defendants have solicited and serviced USF's customers, recruited USF's employees, and used

USF's confidential information to increase or expand the customer base and sales of their new

employer, Agar – all in violation of their agreements not to do so. Agar and Posin have

encouraged and supported those breaches and are knowingly accepting the benefits of those

breaches.

Now, USF has learned, the Former Employee Defendants have worked to divert the

business of Kelly's Roast Beef, a significant long-time USF customer. Kelly's Roast Beef is

apparently about to terminate its relationship with USF on or about February 1, 2004 as a result
of the Former Employee Defendants' wrongful acts. Thus, USF must act immediately and move
for injunctive relief to protect the goodwill and business that it has painstakingly created over the
years and to prevent the Former Employee Defendants' continuing and material breaches of their
agreements – not only as to Kelly's Roast Beef, but also as to the other customers the Former
Employees have agreed not to serve and the USF employees they have agreed not to recruit.

## STATEMENT OF FACTS

The facts set forth herein are derived from the Verified Complaint and the Affidavits and
Declarations of David Bailey, Michael Contarino, Jeff Schaefer, Debra Zielinski and Reed
Newton to which this Court is respectfully referred. *See* Bailey Aff., Contarino Aff., Schaefer
Dec., Zielinski Dec., and Newton Dec., attached to Pl.'s Mot. For Preliminary Injunction at
Exhibits B, C, D, E and F respectively.

USF is in the business of buying, selling and delivering food and related non-food
products to restaurants and to other institutions that serve food, such as schools, government
facilities, cafeterias and hospitals. *See* Bailey Aff., Ex. B, ¶ 6. USF helps its customers obtain
the combination of products they need at an attractive price on a timely delivery schedule. *Id.*
The universe of potential customers for USF's and other food service distributors' services is
large, potentially consisting of every establishment or institution that sells prepared food. *Id.* at ¶
7. From this vast universe of potential customers, USF has developed business relationships and
goodwill with particular customers and has developed strategies for meeting the needs of those
customers so that it can better service them. *Id.*

USF has devoted substantial time and expense to cultivate its customer relationships,
identifying the key decision makers at various customers, learning specialized capabilities of its

-2-

suppliers, and meeting the specialized needs and preferences of its customers. *Id.* at ¶ 8. It has worked to identify the different pricing, product, service, and delivery preferences of its customers and to develop strategies for satisfying them. *Id.* USF maintains the information it uses to develop and service these relationships in confidence and does not share it with others. *Id.* The relationships and confidential and proprietary information USF has developed are the driving force behind its business and give USF a significant advantage over competitors. *Id.*

USF uses Territory Managers, such as defendants O'Hara and Gross, to maintain direct, day-to-day contact with USF's customers. *Id.* at ¶ 9. The Territory Managers spend most of their time on the road, outside USF offices, building direct relationships with USF's customers and working with USF to meet customer needs. *Id.* They present the "face" of USF to its customers. *Id.* In addition to Territory Managers, USF employs USF Executives, such as Tsebetzis and Posin, who oversee and manage the Territory Managers in their respective divisions. *Id.* at ¶ 10. Such supervision includes, among other things, developing new business, maintaining current business, and developing strong relationships with customers through regular, direct contact. As Executives, Tsebetzis and Posin had comprehensive and deep knowledge of USF's efforts to service its customers and its plans to keep its accounts and develop further relationships with them. *Id.* They were charged with learning and developing USF's market and customer strategies for the entire market and learning about specific customers and their needs. They worked with and supervised O'Hara and Gross to develop customer relationships and strategies for serving the customers. *Id.*

USF Territory Managers do not simply quote prices for particular products; rather, they work with customers to help plan menus, to suggest substitute ingredients, and to develop particularized assortments of branded ingredients that may result in a package discount. *Id.* at ¶

-3-

13. In doing so, the Former Employee Defendants became intimately familiar with, among other things, a customer's pricing concerns and product preferences. They also learned substantial information about the products, costs and profit margins, discounts and pricing arrangements USF can offer to the specific customers they served, as well as about USF's more general pricing strategies. *Id.* at ¶ 16. All of this information is reflected in USF Customer Order Guides. USF paid the Former Employee Defendants to use and develop such confidential information and to cultivate customer relationships on USF's behalf. Verified Compl. ¶¶ 21-24.

Once USF has succeeded in developing substantial customer relationships, the Company typically maintains them for a significant period of time. Bailey Aff., Ex. B, ¶ 13. That is true because in building the relationships, the Company's sales representatives get to know the customers in-depth and learn how to satisfy their needs. *Id.* Having worked through this process together, it is generally unusual for a customer to make an abrupt transition to a competitor. *Id.* Here, many of the customers the Former Employee Defendants served for USF have been with the Company for five years, any in many instances even longer. *Id.*

In order to protect its customer relationships and confidential information, USF required each of the Former Employee Defendants to enter into an agreement with USF at the beginning of his employment (the "Agreements"). Copies of these Agreements are attached to USF's Complaint as Exhibits 1-4. Each of the Agreements provide, among other things, that for a period of one year after they leave the employ of USF, they will not directly or indirectly, contact, solicit or sell to specifically those customers or prospective customers with whom they had contact in the prior eighteen months or about whom they had learned confidential information about while employed by USF. *See* Verified Compl. at Ex. 1, ¶ 3; Ex. 2, ¶ 2(b); Ex. 3, ¶ 6; Ex. 4, ¶ 6. Defendants Tsebetzis and Posin also agreed that if they supervised employees

-4-

who had contact with or confidential information about USF customers, they would be "considered to have had contact with all of the Customers with which the Supervised Employees have had contact, and therefore shall be bound by this Section and shall not contact, solicit, sell to or deal with any such Customers." Verified Compl. at Ex. 1, ¶ 3(a); Ex. 2, ¶ 2(b).

The Former Employee Defendants also agreed that for a period of one year after they left the employ of USF, they would not recruit or help recruit any employees of USF to work for a competitor. *See* Verified Compl. at Ex. 1, ¶ 5; Ex. 2, ¶ 2(d); Ex. 3, ¶ 7; Ex. 4, ¶ 7. In addition, the Former Employee Defendants agreed not to use or disclose, whether during or after their employment, confidential information that USF uses in its business. Finally, the Former Employee Defendants agreed that upon leaving the employ of USF, each would return to USF all confidential information in any media and all copies thereof. *See id.*

The Former Employee Defendants have violated these obligations. Tsebetzis voluntarily resigned from USF on April 11, 2003, and went to work for Agar in May 2003. Verified Compl. ¶ 5; Bailey Aff., Ex. B, ¶ 25. Within days, he was joined at Agar by Posin, who had previously resigned from USF on July 11, 2002 to work for a company that was not a USF competitor. Verified Compl. ¶ 6; Bailey Aff., Ex. B, ¶ 25.[1]  In violation of his Agreement with USF, Tsebetzis contacted O'Hara while he was still employed by USF as a Territory Manager to recruit him to work for Agar and based on Tsebetzis' recruiting efforts, O'Hara resigned from

---

[1] While Posin's Agreement expired on July 11, 2003, he is still bound by his confidentiality obligations. Moreover, Posin breached his non-solicitation obligations during the term of his contract through his contact and efforts to divert DOC and Corporate Chef. In addition, Posin is currently encouraging and assisting Tsebetzis, O'Hara and Gross in diverting USF customers and USF employees to Agar, by using the contacts, knowledge and goodwill that Tsebetzis, O'Hara and Gross developed for USF, knowing that Tsebetzis, O'Hara and Gross are bound by their own Agreements with USF. In addition, it appears that Posin has been assisting the other Former Employee Defendants with confidential information.

NY55/332079.5

USF on May 24, 2003, and commenced employment with Agar on May 27, 2003 – just a few short weeks after Tsebetzis did. *Id.*

As detailed in the affidavits, shortly after reuniting at Agar, Tsebetzis, Posin and O'Hara violated their agreements by soliciting and serving on behalf of Agar customers of USF with whom they had had direct or indirect responsibility while employed by USF and customers about whom they learned and developed confidential information while employed by USF. Bailey Aff., at ¶¶ 29-34, *see also* Schaefer, Zielinski and Newton Decs.

Defendant Gross joined the rest of the Former Employee Defendants immediately after he voluntarily resigned from USF on September 5, 2003. *Id.* at ¶ 25. Since joining Agar, and in violation of his Agreement, Gross has contacted a USF Territory Manager in an attempt to recruit him to work with Agar. *Id.* at ¶ 36. While Gross's attempt was unsuccessful – the USF Territory Manager he contacted is still employed with USF - it required time and attention from USF's personnel. *Id.*

USF has received several additional reports that the Former Employee Defendants all have been calling on the customers they had contacted for USF and are attempting to divert the business of those customers to Agar. *Id.* at ¶¶ 3, 37, 47. Apparently, in an attempt to move business from the customers they knew from their work at USF, the Former Employee Defendants are sharing and swapping with each other USF's pricing, product and customer information regarding these customers. These efforts have been successful in diverting business and in reducing margins. USF's Corporate Chef account has already transferred its business, and USF understands that another of its accounts, Kelly's Roast Beef, is about to transfer its business to Agar to be served by Tsebetzis. *Id.* at ¶¶ 33, 47. It is only a matter of time before more violations will also succeed in improperly diverting business.

-6-

When USF became aware of this activity, it immediately informed the individual defendants and their employer that their activities breached their Agreements with USF, and must cease. *See* Verified Compl. at Ex. 6. They have not stopped. Bailey Aff., Ex. B at ¶¶ 2, 4. Accordingly, USF seeks injunctive relief to hold the Former Employee Defendants to their Agreements and to enjoin Agar from benefiting from their violations.

## ARGUMENT

### I.    THE ONGOING VIOLATIONS OF THE CONFIDENTIALITY AND NON-SOLICITATION AGREEMENTS WARRANT INJUNCTIVE RELIEF

USF respectfully requests that this Court enter a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65 enjoining the Defendants from continuing to (1) use or disclose USF's confidential information, (2) contact, solicit or sell to customers with whom they had contact in the eighteen months preceding their respective departures from USF, including through "switching" accounts, or (3) solicit USF employees for employment. USF also seeks to enjoin Posin and Agar, through any of its other sales representatives, from using confidential USF information, from continuing to serve the wrongfully diverted customers or customers about whom the Former Employee Defendants have disclosed confidential information, and from encouraging, assisting or permitting the Former Employee Defendants to violate their Agreements.

### II.    USF MEETS THE STANDARDS FOR INJUNCTIVE RELIEF

Injunctive relief should be granted on a showing: (1) that there is a likelihood that USF will prevail on the merits at trial; (2) that USF will suffer irreparable harm if the injunctive relief sought is not granted; (3) that such injury outweighs any harm that the opposing party would suffer if the injunction were granted; and (4) that the public interest will not be adversely affected if the injunction is granted. *See Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D.

Mass. 1995) (*citing Jackson v. Fair*, 846 F.2d 811, 814-15 (1st Cir. 1988)). Application of these

factors to this case more than meets the standard for injunctive relief.

### A.    USF Is Likely To Succeed On The Merits

In order to ensure uniform enforcement of the similar agreements USF enters into with its

sales representatives nationwide, the Agreement between USF and the Former Employee

Defendants provides that it shall be governed by the laws of the State of Maryland, which is the

state of USF's principal place of business. *See* Verified Compl. at Ex. 1, ¶ 11; Ex. 2, ¶ 2(h); Ex.

3, ¶ 8; Ex. 4, ¶ 8. Courts recognize and enforce standard choice-of-law provisions employed by

nationwide corporations. *See, e.g., Morris v. Watsco, Inc.*, 385 Mass. 672, 674-75 (1982)

(Massachusetts courts give effect to the law reasonably chosen by the parties to govern their

rights under contracts.); *American Express Financial Advisors, Inc. v. Topel*, 38 F. Supp. 2d

1233, 1238 (D. Colo. 1999) (honoring a choice of law provision where national corporation had

"a strong interest in having its contracts uniformly interpreted under [the chosen state's] law").

Under both Maryland and Massachusetts law, the Agreements at issue here are valid and

enforceable and the breaches of those Agreements can be enjoined. In addition, the activities

that Agar and Posin are engaging in to encourage the breach of those Agreements can likewise

be enjoined.

USF has asserted claims for, among other things, breach of contract and tortious

interference with contractual relations. USF is likely to succeed on the merits of both of those

claims. As more fully set forth below, Maryland and Massachusetts courts will enforce valid

non-solicitation agreements to protect customer relationships and confidential information.

*Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 639 (D. Md. 1998); *Veridiem, Inc. v. Phelan*, No.

034418BLS, 2003 WL 22481390 (Mass. Super. Ct. Sept. 26, 2003); *Modis, Inc v. Revolution*

*Group, Ltd.*, No. 991104, 1999 WL 1441918 (Mass. Super. Ct. Dec. 29, 1999). Once a plaintiff

establishes that defendant is breaching a valid and enforceable non-solicitation agreement and

that the unauthorized use of its protectible information threatens plaintiff's goodwill, irreparable

injury to the plaintiff is presumed. *See Shipley Co. v. Clark*, 728 F. Supp. 818, 827 (D. Mass.

1990); *All Stainless, Inc. v. Colby*, 364 Mass. 773, 779-80 (1974). As set forth below, the

evidence easily satisfies the standard for a preliminary injunction.

### 1.     Defendants Breached Valid Agreements

It is well established that "if a restrictive covenant in an employment contract is

supported by adequate consideration and is ancillary to the employment contract, an employee's

agreement not to compete with his employer upon leaving the employment will be upheld if the

restraint is confined within limits which are no wider as to area and duration than are reasonably

necessary for the protection of the business of the employer and do not impose undue hardship

on the employee or disregard the interest of the public." *Becker v. Bailey*, 299 A.2d 835, 838

(Md. 1973) (quoting *Ruhl v. F. A. Bartlett Tree Expert Co.*, 225 A.2d 288, 291 (1967);

*MacIntosh v. Brunswick Corp.*, 215 A.2d 222, 225 (Md. 1965)), *accord Holloway v. Faw,*

*Casson & Co.*, 552 A.2d 1311 (Md. App. 1989).

Massachusetts law is similar. *See Bowne of Boston, Inc. v. Levine*, No. Civ. A. 97-

5789A, 1997 WL 781444, *2 (Mass. Super. Ct. Nov. 25 1997) ("[a]n employer may enforce the

terms of a non-solicitation agreement with a former employee when it demonstrates that the

agreement (a) is necessary to protect a legitimate business interest of the employer, (b) is

supported by consideration, (c) is reasonably limited in all circumstances, including time and

space, and (d) is otherwise consonant with public policy.") (internal citations omitted). As set

forth below, the Agreements at issue here are valid and enforceable and the issuance of a

preliminary injunction is warranted.

#### a.    Legitimate Interest of USF

As the Former Employee Defendants acknowledged in their Agreements, USF has two compelling protectible interests here – the client relationships it paid the Former Employee Defendants to develop and serve and the confidential information USF uses to serve them. *See* Verified Compl. Ex. 1 at ¶ 2; Ex. 2 at ¶ 1(a); Ex. 3 at ¶ 1(a), and Ex. 4 at ¶1(a).

Maryland and Massachusetts courts have both recognized these as protectible interests, as well. *See Intelus Corp.* 7 F. Supp. 2d at, 639 (an employer's interest in maintaining a non-competition agreement is "strongest for businesses in which the personal contacts between the employee and the customer are an important element determining the business's success."); *Marcam Corp.*, 885 F. Supp. at 298 ("It is well-settled that a non-competition agreement may be enforced to protect a company's reputation and its relationship with its customers.") (*citing New England Tree Expert Co. v. Russell*, 306 Mass. 504 (1940); *Kroeger v. Stop & Shop Cos.,* 13 Mass. App. Ct. 310, 316 (1982)).

In *Silver v. Goldberger*, 188 A.2d 155, 158 (Md. 1963), the Maryland Court of Appeals holds:

> The *"restraint is justified* if a part of the compensated services of the former employee consisted in the creation of good will of customers and clients which is likely to follow the person of the former employee...

*Id.* The Court further explained that non-compete agreements of "agents, salesmen, delivery men and other employees who, in operating the regular route or in servicing the same customers constantly come into contact with customers of the employer, usually come within the class or type of cases in which justification does exist." *Id.* Applying this rationale, in *Fowler v. Printers II*, 598 A.2d 794 (Md. Ct. Spec. App. 1991), the Maryland Court of Special Appeals found that a former employer had a legitimate interest that was protected by a restrictive covenant where the

-10-

former employee's services involved in creating the goodwill of clients who were likely to and, in fact, did follow her when she left her former employer, and where the former employee vigorously, repeatedly, and successfully solicited her former employer's customers. *Id.* at 799. Likewise, in Massachusetts, in enforcing a non-solicitation agreement in the recruiting field, the Court in *Modis, Inc.*, 1999 WL 1441918, *7-8 stated:

> The knowledge of an employer's clients and its consultants . . . is not the type of general skills that a former employee may take from one job to the next without fear of enforcement of a restrictive covenant. Instead, it is the type of confidential information that [an employer] has spent significant sums and put significant efforts into building the good-will of its business and client relationships. This is the type of legitimate business interest which may be enforced by way of a restrictive covenant.
>
> \* \* \* \* \* \* \*
>
> The fact that certain [clients] are well known corporations does not diminish the fact that this constitutes confidential information and/or the good-will. It is the relations with the corporate clients that [the employer] has built up which constitutes the good-will.

*Id.* (Internal quotations omitted). *See also Oxford Global Resources, Inc. v. Consolos*, No. CA024763BLS2, 2002 WL 32130445, *4 (Mass. Super. Ct. May 6, 2002) ("[Goodwill] is an interest that legitimately may be protected through enforcement of covenants not to compete. One of the particular settings in which courts have been willing to enforce such covenants in order to preserve good will is in sales and marketing competition by former sales employees."); *Bowne of Boston, Inc.,* 1999 WL 781444, *3 (internal citations omitted) (finding that "goodwill" refers to "the employer's positive reputation in the eyes of its customers ... [and] is generated by repeat business with existing customers or by referrals to potential customers" and holding that the corporate printing business involves goodwill that the employer legitimately protected through restrictive covenants with its employees); *All Stainless, Inc.,* 364 Mass. at, 780 (finding

that All Stainless established a legitimate interest in protecting its goodwill where "the former

employee's close association with the employer's customers may cause those customers to

associate the former employee, and not the employer, with products of the type sold to the

customer through the efforts of the former employee.").

Thus, the courts draw a distinction "between the cases where business success is

attributable to the quality of the product being sold, and those where the personal contact of the

employee with the customer is an *important factor*. In the latter case, the employer has stronger

need for protection against diversion of his business to the former employee who has had

personal contacts with customers which the employer lacks." *Millward v. Gerstung Int. Sport

Educ., Inc.*, 302 A.2d 14, 17 (Md. 1973) (internal quotations omitted). The Maryland Court of

Appeals, in *Ruhl,* 225 A.2d at 292, explained the reasoning as follows:

> In almost all commercial enterprises, except in the few cases in
> which the market approaches the ideal of perfect competition,
> contact with customers or clientele is a particularly sensitive aspect
> of the business.... In most businesses... as the size of the operation
> increases, selling and servicing activities must be at least in part
> decentralized and entrusted to employees whose financial interests
> in the business is limited to their compensation. The employer's
> sole or major contact with buyers is through these agents and the
> success or failure of the firm depends in part on their effectiveness.
> Although the employee's job may be limited to servicing an
> existing customer route or list, or dealing with those who come to
> the employer's place of business or do business by mail or
> telephone, in many cases he is expected to bring in new business.
> In any of these situations, the possibility is present that the
> customer will regard, or come to regard, the attributes of the
> employee as more important in his business dealings than any
> special qualities of the product or service of the employer,
> especially if the product is not greatly differentiated from others
> which are available. Thus, some customers may be persuaded, or
> even be very willing, to abandon the employer should the
> employee move to a competing organization or leave to set up a
> business of his own.

*Id.* (internal quotations omitted).

Here, Gross and O'Hara had direct and constant contact with USF's customers that they served. As part of their job responsibilities, they were involved in pricing decisions, strategic sales and marketing decisions, policy decisions, as well as, most importantly, forging and maintaining customer relationships.

In addition, Posin and Tsebetzis were responsible for overseeing USF's sales operations at USF's Boston-Everett division, and overseeing responsibility for all of its customer and sales-force relationships  They were responsible for a large amount of sales and marketing activities and functions of the Boston-Everett division. Tsebetkis was directly responsible for supervising O'Hara and Gross. Tsebetzis and Posin also had access to any and all confidential and proprietary sales, marketing and credit information relating to customers of USF. In this supervisory capacity, Posin and Tsebetzis had access to all confidential information concerning USF Territory Managers, including their salary, commission and other employee-related information. Posin and Tsebetzis were also in constant direct contact with USF's key accounts. As such, they gained substantial knowledge with respect to all of the desires, needs and requirements of all of USF's biggest accounts, and also with respect to USF's competitive, confidential and proprietary information. Thus, through their employment with USF, *all* of the Former Employee Defendants learned and developed confidential information and forged personal relationships with many USF customers, which relationships they are now exploiting for the benefit of themselves and their new employer, Agar.

Without contracts preventing an employee from misappropriating its goodwill after resigning, USF would be unwilling to introduce that employee to its customers, and to allow that employee to become a part of USF's valuable customer relationships. This is precisely why the

-13-

Maryland and Massachusetts courts repeatedly have held that non-solicitation agreements, such as those at issue here, are justified and may be enforced.

### b.    The Agreements Were Supported by Consideration

Each of the Former Employee Defendants entered into their Agreements with USF shortly after they commenced employment, and as a condition of employment with USF. Thereafter, Tsebetkis, Posin and O'Hara enjoyed employment with USF for over ten years and Gross enjoyed employment with USF for two years. Under their Agreements, all of the Former Employee Defendants received substantial compensation for their services. Both Maryland and Massachusetts courts have held that continued employment alone is valid consideration for a non-compete agreement where the employment is at will (*i.e.*, where the employment can be terminated at any time). *Simko, Inc. v. Graymar Co.*, 464 A.2d 1104 (Md. Ct. Sec. App.), cert. denied, 469 A.2d 452 (Md. 1983); *Avallone v. Elizabeth Arden Sales Corp.*, 344 Mass. 556 (1962); *Wilkinson v. QCC, Inc.*, No. 99-P-1854 (Mass. App. Dec. 21, 2001) ("to the extent new consideration was required, continued employment was the consideration."). Accordingly, there can be no dispute that the Agreements were supported by sufficient consideration, by way of continued employment and other valuable consideration the Former Employee defendants gained over the course of their employment with USF, and are therefore enforceable.

### c.    The Agreements Are Reasonable In Geography and Time

The Agreements involved in this case are narrowly tailored to protect USF's legitimate interests. They are not non-competition agreements — they do not prevent the former employees from accepting employment with a competitor. They merely restrict the employee from soliciting a very small subset of the available potential customers, namely those with whom the employee had personal contact on behalf of USF. The customers to whom the restriction

-14-

applies are exactly the ones in whom USF's protected interest is vested: those with whom the employee enjoyed and established USF's goodwill.

The restrictions are also reasonably limited in duration: only one year post-employment. Maryland and Massachusetts courts have both routinely upheld longer restrictions. *See, e.g., Millward,* 302 A.2d 14 (2-year covenant covering Baltimore and the surrounding counties was reasonable where the employee had established personal contacts through his employment with plaintiff); *Ruhl,* 225 A.2d 288 (two-year covenant covering a six county area was reasonable where the employee was involved in a highly competitive business and there was no threat to the public interest); *Stone Legal Resources Group, Inc. v. Glebus*, No. CA025136, 2003 WL 914994, *6 (Mass. Super. Ct. Dec. 16, 2002) (18-month non-solicitation provision reasonable); *All Stainless, Inc.*, 364 Mass. at 779 (two-year restriction reasonable); *Bowne of Boston, Inc.*, 1997 WL 781444, *5 (two-year restriction reasonable).

Furthermore, the restriction's scope, by definition, does not extend beyond the limits of the interest USF seeks to protect. The agreements only restrict contact with those customers with whom the employees had personal contact, or about whom they gained confidential information at USF. *See Intelus Corp.*, 7 F. Supp. 2d 635 (D. Md. 1998) (covenant that contained a customer restriction but lacked a geographic limitation was enforceable); *Browne v. Merkert Enterprises, Inc.*, No. Civ. A. 98-386, 1998 WL 151253 (Mass. Super. Ct. Mar. 31, 1998) (enforcing six-month restriction prohibiting former employee from contacting principals or customers of his former employer with the intention of diverting business away from that employer); *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 491, 502 (1986) (enforcing five-year non-solicitation of customer provision stating defendant could not "solicit, sell, serve, divert or receive" business from former customers).

-15-

### 2.    Posin and Agar Tortiously Interfered With USF's Confidentiality And Non-Solicitation Contracts With Its Employees

To state a claim for tortious interference with contractual or business relationships, USF needs to demonstrate that (1) the Former Employee Defendants had contracts with USF; (2) Posin and the Agar Defendants knowingly interfered with those contracts; (3) that Posin and the Agar Defendant's interference, in addition to being intentional, was improper in motive or means; and (4) that USF was harmed by such actions. *Clermont v. Fallon Clinic, Inc.,* No. Civ. A. 2001-1512 B, 2003 WL 21321190, *11-12 (Mass. Super. Ct. May 15, 2003).

These elements are be met here. With the Agar Defendants' knowledge and support, the Former Employee Defendants contacted, solicited and sold to the customers with whom they were in contact at USF and attempted to recruit to Agar other USF employees to Agar. Further, it appears that the Former Employee Defendants are using, with Agar's blessing, and Posin's participation, USF's confidential pricing and customer information – through improper means. The defendants have  continued their activities, even after USF informed the corporate defendants of the Agreements and that the violations of them must cease. The solicitations were, on their face, intended to damage USF's business by improperly diverting its customers thereby misappropriating the substantial investment USF had made in each. And finally, the evidence shows that in fact some customers have already been diverted and more are in jeopardy. Moreover, Agar has hired other USF employees who also violated their agreements. Bailey Aff., Ex. B at ¶ 43.

## III.    USF WILL BE IRREPARABLY HARMED ABSENT INJUNCTIVE RELIEF

USF is suffering and will continue to suffer immediate, substantial and irreparable harm in the form of lost clients and lost goodwill injury if its request for injunctive relief is denied. Indeed, each of the Former Employee Defendants specifically agreed in the Agreements that the

NY55/332079.5

harm resulting from a violation would be irreparable and that entry of an injunction was an appropriate remedy. *See* Verified Compl. at Ex. 1, ¶ 17; Ex. 2, ¶¶ 1(a), 2(n); Ex. 3, ¶¶ 1(a), 15; Ex. 4, ¶¶ 1(a), 15.

Even absent the Former Employee Defendants' acknowledgement, Maryland and Massachusetts courts have expressly found that harm of the type USF will suffer is severe and will result in irreparable injury. For instance, in *Darwin Partners, Inc. v. Signature Consultants, LLC*, No. 00-0277, 2000 WL 33159238 (Mass. Super. Ct. Mar. 24, 2000), the Massachusetts Superior Court issued a preliminary injunction restraining Darwin's former employees as well as their new employer from further soliciting any of Darwin's company client accounts with whom any of the former employees had placed contractors during their employment with Darwin. In so ruling, the Court found that:

> Darwin is likely to establish that, since September 1999, the individual defendants have been actively soliciting Darwin's corporate accounts. Thus, there already may have been a loss of goodwill and a misuse of confidential information. In any event, there is a very strong potential for future loss of goodwill and confidential information. Such damage to goodwill is likely to be irreparable in that, once it occurs, it cannot be undone and its financial implications are almost impossible to measure. Thus, these interests are very difficult to quantify and are appropriate to enforce by means of equitable relief.

*Id.* at *5. *See also, Stone Legal Resources Group, Inc.*, 2003 WL 914994, *6 (holding that "the loss of goodwill has been recognized as being particularly hard to quantify, giving rise to the need for equitable relief" and finding that "because Stone Legal has demonstrated a loss of goodwill, it has established irreparable harm.") (internal citations omitted). The law in Maryland is similar. *Intelus Corp.*, 7 F. Supp. 2d at, 639 (finding that an employer established the threat of irreparable harm where the success of its business is dependent on the personal contacts it fosters

-17-

between its account managers and its customers and where its former employee was attempting to contact those customers to divert business to his new employer).

## IV.    ON BALANCE, THE HARM TO USF FAR OUTWEIGHS THE HARM, IF ANY, TO THE FORMER EMPLOYEE DEFENDANTS

The defendants' unlawful activities have continued until the present in spite of USF's good-faith efforts to put a stop to violations of the Agreements without court intervention. USF has no adequate remedy at law to alleviate this irreparable harm. USF's relationship with its clients and the confidential information it uses to service those relationships are among its most valuable assets. Once pirated away by defendants, USF's former customers will be difficult to reacquire, and the damages sustained will be largely incalculable.

By contrast, immediate injunctive relief would result in *no harm* to the defendants. On information and belief, each of the Former Employee Defendants has a guaranteed salary with Agar. USF does not seek to prevent the Former Employee Defendants from remaining or competing in the food service business, even with Agar, or from soliciting USF's established customers with whom they did *not* have contact with or learn confidential information about. They are free to solicit and serve any other customers in the Massachusetts market or anyplace else. USF is only seeking to protect the customer goodwill and confidential information it paid the Former Employee Defendants to develop. *See Intelus*, 7 F. Supp. 2d at 640 (finding that the balance of hardship favored the employer where employer suffered the harm of lost clients and lost goodwill, and employee suffered harm of finding temporary employment for the duration of the non-compete period); *Veridiem, Inc. v. Phelan*, 2003 WL 22481390, * 3 (enjoining former employee from working for a competitor for one year when the employee had significant contact with customers and prospective customers and was involved in fostering the goodwill that the employer acquired through dealings with its customers.) *See also Ruhl v. Bartlett Tree Co.,*

-18-

*supra*, enforcing a two year covenant in the face of a claim that doing so would harm the employee.

Moreover, neither Agar nor Posin are privileged to interfere with the Former Employee Defendants' Agreements or to retain the benefit of their breach.

## V.    PUBLIC POLICY CONCERNS

An essential condition to the validity of a restrictive covenant in an employment contract is that it causes no substantial injury to society. Where a business is highly competitive and there is no danger of the creation of a monopoly, the courts generally will uphold the non-compete agreement as not being injurious to the public interest, provided that the time and geographic restriction is reasonable. *See Hekimian Lab., Inc. v. Domain Sys. Inc.*, 664 F. Supp. 493, 499 (S.D. Fla. 1987) (applying Maryland law). *See also Bowne*, 1997 WL 781444 at *5 ("this Court could find no Massachusetts case in which a court struck down a non-competition or non-solicitation clause because it jeopardized public policy, except in those cases dealing with agreements between doctors, lawyers or securities brokers."). In the present instance, because USF does not hold a monopoly on the services it offers to the public, and since, in fact, the business is quite competitive, no danger to the public interest would arise by enjoining the Former Employee Defendants' violations of the Agreements, and Posin and Agar's tortious interference with those Agreements. The public's interest in enforcing legitimate agreements and protecting legitimate business interests will be served. *Shipley Co.,* 728 F. Supp. at, 826 ("Massachusetts has an equally strong interest in protecting Massachusetts businesses from breaches of employment agreements and consequent losses of good will.")

NY55/332079.5

## VI.    THE BOND, IF ANY, SHOULD BE NOMINAL

Because the defendants will be prohibited only from dealing with a narrow class of

customers and/or employees in violation of the non-competition and non-solicitation agreements,

neither they nor Agar will suffer any compensable harm.  As a result, the bond, if any, imposed

upon USF pursuant to Fed. Rule Civ. P. 65(c) should be nominal.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court grant USF's

motion for a preliminary injunction.

RESPECTFULLY submitted this 9th day of January, 2004.

U.S. FOODSERVICE, INC.

By its attorneys,

Laurence H. Reece, III
BBO# 414460
Alana A. Prills
BBO# 652881
REECE & ASSOCIATES, P.C.
One Bowdoin Square
Boston, Massachusetts 02114
(617) 747-7550

*OF COUNSEL*:
Victoria A. Cundiff
Rebecca Kelder Myers
Danielle M. White
PAUL HASTINGS JANOFSKY & WALKER LLP
75 E. 55th Street
New York, New York 10022
(212) 318-6000

NY55/332079.5

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of this document to be served by Fedex upon Arthur Tsebetzis, 66 Bridge Street, Medfield, Massachusetts 02052, Steven Posin, 162 Millville Street, Salem, New Hampshire 03079, John J. O'Hara, 18 Sunnybank Road, West Roxbury, Massachusetts 02132, Jeffrey E. Gross, 54 Outlook Road, Marshfield, Massachusetts 02050, and Agar Supply, Inc., Myles Standish Industrial Park, 225 John Hancock Road, Taunton, Massachusetts 02780, and by U.S. mail, postage prepaid, upon Victoria A. Cundiff, Esquire, Paul, Hastings, Janofsky & Walker LLP, 75 East 55th Street, New York, New York 10022, on this __9__ day of January 2004.

_Alana Prills_
Alana A. Prills