United States District Court
District of Massachusetts



**U.S. Foodservice, Inc.,**
*Plaintiff,*

v.

**Arthur Tsebetzis, Steven Posin, John J. O'Hara, Jeffrey E. Gross, and Agar Supply, Inc.,**
*Defendants.*

Civil Action No. 03-12603-RCL

# Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction

## Introduction

U.S. Foodservice (USF) moves for an injunction to enforce its nonsolicitation agreements against its former employees. This Court should deny USF's motion for three reasons:

- **No legitimate business interest.** USF is not likely to succeed on the merits because the nonsolicits do not protect USF's goodwill, which the company itself destroyed when it admitted a $1.1 billion accounting fraud last February, placing it alongside Enron and WorldCom in the pantheon of corporate wrongdoers. Nor do the agreements protect any confidential business information.

- **Unclean hands.** USF comes to the Court with unclean hands. It accuses Agar Supply, the former employees' new employer, of the same unfair competition that USF itself has practiced over the years. Also, USF got the employees to sign the nonsolicits by making false promises.

- **No irreparable harm.** USF cannot show immediate, irreparable harm. The employees have been working for Agar for many months without harming USF. The only harm USF has suffered has come from its widely publicized fraudulent behavior.

USF asks this Court to believe that it is losing customers because its former employees are working for a competitor in violation of their nonsolicits. This must be so, claims USF

executive David Bailey, because it is "generally unusual" for USF to lose longstanding customers.[1] But nowhere in its papers does USF mention the single biggest event in its recent corporate history: its spectacular revelation of a billion-dollar accounting fraud. Telling the USF story as its attorneys have done is like narrating the demise of the *Titanic* without mentioning the iceberg. Instead, USF tries to lay the blame for its self-inflicted turmoil on four former employees and a smaller rival.

## Brief Statement of Facts

U.S. Foodservice is the nation's second-largest food distributor.[2] A subsidiary of Dutch-based Royal Ahold N.V. (Ahold), the world's third-largest retailer, USF sells food to restaurants, hotels, and institutions.[3] Food-service companies like USF compete on "service quality, product quality and depth, and price,"[4] and they compete for customers as well as for employees.[5]

Arthur Tsebetzis worked in the food-service industry for 12 years before joining USF in 1990, bringing with him $20 million in business, including that of Kelly's Roast Beef.[6] He rose to the positions of senior vice president and division president.[7] Stephen Posin worked in the food-service industry for 5 years before joining USF in 1989.[8] He rose to the position of vice

---

[1] Plaintiff's Memorandum of Law in Support of its Motion for a Preliminary Injunction ("Plaintiff's Memo."), Ex. B, Bailey Aff. ¶ 13.
[2] Ahold Amended Annual Report for FY 2002 (Form 20-F/A) ("Annual Report"), filed with the Securities and Exchange Commission Oct. 31. 2003, at 40, *available at* http://www.ahold.com (excerpts attached as Ex. A).
[3] *Id.*; Brooke A. Masters, "Ahold Ousts CEO at U.S. Foodservice," *Wash. Post*, May 14, 2003, at E1, *available at* http://www.washingtonpost.com (attached as Ex. B).
[4] Annual Report at 21.
[5] *Id.*
[6] Tsebetzis Aff. ¶¶ 2, 3 (attached as Ex. C).
[7] *Id.* ¶ 1.
[8] Posin Aff. ¶ 1 (attached as Ex. D).

2

president of national accounts.[9] John O'Hara worked as a salesman in the industry for 5 years before joining USF in 1987, bringing many of his customers with him.[10] Jeffrey Gross worked as a salesman for USF's competitor Alliant for seven or eight months before joining the company in 2001.[11] His new managers, knowing that he had a nonsolicitation agreement with Alliant, asked him to identify his previous customers and their buying needs so that other USF salespeople could go solicit them.[12]

USF made each man sign a nonsolicitation agreement, designed to keep them from taking customers to a competitor for a year after they left USF.[13] Tsebetzis and Posin signed their agreements in exchange for the opportunity to purchase stock options.[14] O'Hara and Gross signed their agreements in exchange for participating in USF's "Points of Focus" commission program.[15]

Posin resigned from USF in July 2002 and ten months later joined Agar, a much-smaller, family-run, local competitor.[16] As it happened, he got out just in time.

On February 24, 2003, Ahold publicly admitted that USF had been fraudulently overstating its earnings from the promotional rebates it received from vendors.[17] Ahold's stock price plunged sixty percent overnight, civil and criminal investigations began in earnest in the United States and Europe, and angry shareholders filed dozens of lawsuits.[18] The amount of the

---

[9] *Id.*
[10] O'Hara Aff. ¶ 1 (attached as Ex. E).
[11] Gross Aff. ¶ 1 (attached as Ex. F).
[12] *Id.*
[13] V. Compl. Exs. 1–4.
[14] Tsebetzis Aff. ¶ 6; Posin Aff. ¶ 1.
[15] *Id.*
[16] Posin Aff. ¶¶ 1, 2.
[17] Brooke A. Masters, "U.S. Problems Caught Ahold by Surprise," *Wash. Post*, Mar. 14, 2003, at E1, *available at* http://www.washingtonpost.com (attached as Ex. G).
[18] *Id.*; Brooke A. Masters, "Ahold Raises Error Total to $1.1 Billion," *Wash. Post*, July 2, 2003, at E1, *available at* http://www.washingtonpost.com (attached as Ex. H).

scandal rose steadily from hundreds of millions of dollars to $1.1 billion.[19] Most of USF's top executives were forced out, and the company's worldwide reputation was destroyed.[20] Since the announcement, Ahold has been constantly in the news, drawing frequent comparisons to Enron, WorldCom, and Tyco.[21] Its reputation in shambles, customers and employees fled USF for its competitors.[22]

Tsebetzis, who had signed his nonsolicitation agreement in exchange for stock options just days before the scandal broke, suddenly found those options worthless.[23] After learning that USF was also reneging on the $50,000 bonus he was owed, he resigned and went to work for Agar in May 2003.[24] Later that month, O'Hara also left and went to Agar.[25] Gross followed in September.[26] Under the terms of the "Points of Focus" program, which was the consideration for O'Hara and Gross's nonsolicits, they lost any commissions that they were owed.[27]

None of these men solicited any USF employees to come to Agar.[28] Tsebetzis and Gross haven't solicited any USF customers to do business with Agar.[29] Posin didn't solicit any USF customer before his nonsolicit expired last July.[30] O'Hara sold to a single USF customer (for a profit of about $100), but otherwise has sold to no USF customers. On the other hand, the former

---

[19] Brooke A. Masters, "Ahold Raises Error Total to $1.1 Billion," *Wash. Post*, July 2, 2003, at E1, *available at* http://www.washingtonpost.com (attached as Ex. H).
[20] *Id.*
[21] *See, e.g.,* Noelle Knox, "Europeans slow to reform accounting standards," *USA Today*, Jan. 19, 2004, *available at* http://www.usatoday.com/money/world/2004-01-19-parmeurope_x.htm (attached as Ex. I).
[22] Tsebetzis Aff. ¶ 13.
[23] Tsebetzis Aff. ¶ 9.
[24] Tsebetzis Aff. ¶ 19; Cordin Aff. ¶¶ 2–8 (attached as Ex. J).
[25] O'Hara Aff. ¶¶ 1, 2.
[26] Gross Aff. ¶ 1.
[27] O'Hara Aff. ¶ 9; Manning Aff. ¶ 3, Points of Focus Program Rules (attached as Ex. K).
[28] Tsebetzis Aff. ¶ 22; Gross Aff. ¶ 9; O'Hara Aff. ¶ 4; Posin Aff. ¶ 11.
[29] Gross Aff. ¶ 12; Tsebetzis Aff. ¶¶ 22–23.
[30] Posin Aff. ¶ 12.

4

USF employees have felt they had to decline business from former customers who have approached them.[31]

While it is true that USF customers Kelly's Roast Beef and Corporate Chefs have recently transferred their business to Agar, their executives have testified that it was not because of the efforts of the former USF employees.[32] Instead, these customers switched to Agar because of USF's higher prices and poor service,[33] two problems that Ahold concedes in its latest annual report.[34] In fact, these customers explained this to USF division president David Bailey before he filed the principal affidavit supporting USF's motion.[35] But Bailey's affidavit omits these damaging facts and contains statements that these customers had told him were false.[36]

Now, after losing customers because of problems it brought upon itself, USF asks this Court to shift the blame to its former employees.

## Argument

### 1. The Court should deny the motion because the nonsolicits do not protect USF's already-damaged goodwill, nor do they protect any confidential business information.

USF cannot win its injunction unless it can show that it is substantially likely to win at trial and that the balance of harms leans in its favor.[37] To win at trial, USF must prove that the nonsolicits are necessary to protect its legitimate business interests: namely, customer goodwill

---

[31] *See* O'Hara Aff. ¶ 9.
[32] Ayres Aff. ¶ 13 (attached as Ex. L); Harron Aff. ¶ 7 (attached as Ex. M).
[33] Ayres Aff. ¶¶ 12–13.
[34] Annual Report at 70, 71
[35] *See* Plaintiff's Motion for Preliminary Injunction.
[36] *See* Bailey Aff. ¶¶ 1–47; Harron Aff. ¶¶ 4, 7; Ayres Aff. ¶¶ 7, 8, 9, 13.
[37] *Ikon Office Solutions, Inc. v. Belanger*, 59 F. Supp. 2d 125, 128 (D. Mass. 1999).

and confidential business information.[38] Courts generally disfavor restrictive covenants, and an employer may not use them to stifle free competition or to deprive an employee of the opportunity to use his or her acquired skills and knowledge to earn a living.[39] The Court should deny USF's injunction because these agreements do not seek to protect customer goodwill or confidential business information.[40]

### A. The Court should deny the injunction because the nonsolicitation agreements do not protect customer goodwill.

Massachusetts has long defined "goodwill" as the positive reputation a company enjoys from its customers. In *Angier v. Webber*, the Supreme Judicial Court defined an employer's goodwill as the advantage "derived from their reputation for promptness, fidelity and integrity in their transactions ...."[41] To win an injunction to protect its goodwill, an employer must prove that it actually has goodwill that the employee is in a position to harm.[42] In this case, USF has so thoroughly tarnished its own reputation that four former employees could not damage it any further.

Although USF is silent about its tarnished reputation in its pleadings, the company has publicly conceded the staggering damage to its goodwill that its accounting fraud has caused. In the amended Fiscal Year 2002 annual report it filed with the Securities and Exchange

---

[38] *Marine Contractors Co. v. Hurley*, 365 Mass. 280, 287 (1974). Defendants agree with Plaintiff that Massachusetts law is essentially the same as Maryland law on this topic. *See, e.g., Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 639 (D. Md. 1998); Plaintiff's Memo. at 8.
[39] *Routhier Placement Specialists, Inc. v. Brown*, 15 Mass. L. Rep. 246 (2002), 2002 Mass. Super. LEXIS 362 at *3.
[40] *See New England Canteen Service, Inc. v. Ashley*, 372 Mass. 671, 674 (1977).
[41] *Angier v. Webber*, 96 Mass. (14 Allen) 211, 216 (1867).
[42] *William Gallagher Assocs. Ins. Brokers v. Everts*, No. 99-0519, 2000 Mass. Super. LEXIS 705 at *30 (Sept. 6, 2000).

Commission three months ago, Ahold warns investors about the damage its malfeasance has caused:

- "Our inability to reverse *the negative perception of us* may continue to adversely affect our business."[43]
- "The issues that we announced on February 24, 2003, the related internal and external investigations and events and our related public announcements have had *a negative impact on the public's perception of us*."[44]
- "If [because of] the disclosures we have made and related negative publicity or otherwise, our current and potential customers and vendors continue to perceive us as *having a tarnished reputation* or financial difficulties, our customers may decide not to shop in our stores or purchase products from us, or our vendors may not supply us with their products or services ...."[45]
- "[W]e may find it difficult, or we may be unable, to reverse the *reputational consequences of this negative publicity*."[46]
- "Continuing *negative publicity or lasting reputational damage* could have a material adverse effect on our financial condition, results of operations and liquidity."[47]

Ahold is not the only one focusing on the scandal. The February 2003 revelations have already led to dozens of lawsuits against Ahold for violations of securities law and ERISA.[48] The Department of Justice, the FBI, the Department of Labor, the SEC, the New York Stock Exchange, the NASD, and European authorities have begun criminal and civil investigations.[49] And a Google search of the terms "Ahold" and "fraud" together leads to 9040 different webpages.[50]

---

[43] Annual Report at 11 (emphasis added).
[44] *Id.* (emphasis added).
[45] *Id.* (emphasis added).
[46] *Id.* (emphasis added).
[47] *Id.* (emphasis added).
[48] Brooke A. Masters, "Ahold Ousts CEO at U.S. Foodservice," *Wash. Post*, May 14, 2003, at E1, *available at* http://www.washingtonpost.com.
[49] Annual Report at 130–32.
[50] http://www.google.com/search?q=Ahold+fraud (last visited Feb. 1, 2004) (attached as Ex. N).

7

But the fraudulent accounting practice is just the tip of the iceberg. USF has engaged in other deceptive practices that show how little it cares about maintaining goodwill. For example:

- USF has inflated its costs to customers via fictitious or USF-controlled middlemen and transport companies. Since USF bills its customers on a "cost-plus" basis — charging its customers for the cost of goods *plus* a certain percentage — USF has artificially and fraudulently inflated the prices its customers pay.[51]

- USF has had a practice of "forcing off" vendor receivables. After a vendor invoice remains unpaid for a certain period — usually six or nine months — USF would "force off" the receivable, removing it from the accounts payable ledger and fraudulently adding it to revenue.[52]

- USF has pocketed its own customers' funds in a practice known as "washing." If a customer overpays USF and ends up with a credit balance in its account, USF "washes" the credit off the account after a certain period of time. In doing so, USF decreases the balance in the customer's account and adds that amount to its own revenue.[53]

- USF has had a program called "puffing" in which it tells vendors that a customer has requested more of a specially discounted product than it actually has. This enabled USF to increase its income by obtaining discounts that it had not properly earned.[54]

As these practices are made public, USF's goodwill should continue to diminish.

In his affidavit supporting this motion, Bailey claims that "[a]bsent defendants' activities, we would have expected to retain and expand this business and the customer goodwill."[55] He also testifies that "there was no reason to expect that USF would lose our customers' business, and certainly not so precipitously, if the Former Employee Defendants had not breached their respective agreements."[56] But nowhere in its pleadings has USF been able to show that the former employees damaged the company's goodwill. On the contrary: before they left USF, their

---

[51] Tsebetzis Aff. ¶ 12; Goffredo Aff. ¶ 7 (attached as Ex. O).
[52] Tsebetzis Aff. ¶ 12; Goffredo Aff. ¶ 7.
[53] Tsebetzis Aff. ¶ 12; Goffredo Aff. ¶ 7.
[54] Tsebetzis Aff. ¶ 12; Goffredo Aff. ¶ 7.
[55] Bailey Aff. ¶ 4.
[56] *Id.* at ¶ 45.

customers barraged them with questions about USF's fraudulent practices and prospects for survival.[57] And executives at Corporate Chefs and Kelly's Roast Beef have testified that they left USF for Agar because of USF's poor service and high prices, problems that Ahold concedes in its annual report.[58] Because USF cannot show that the employees' conduct could make USF's already-damaged reputation any worse in the eyes of its customers, the Court should deny USF's request for an injunction.

### B.   The Court should deny the injunction because the nonsolicitation agreements do not protect confidential business information.

Likewise, USF fails to prove that it needs the nonsolicits to protect confidential business information.[59] Although USF claims it has confidential information and that the former employees had access to it,[60] it fails to offer any evidence to support these claims.

Massachusetts law only protects an employer's confidential business information or trade secrets if the information is in fact a secret.[61] For example, in *J.T. Healy & Sons v. Murphy & Sons*, an employer sought to prevent its former employees from using its trade secrets to open a competing business.[62] The trial court denied the injunction.[63] Affirming the decision, the Supreme Judicial Court held that a trade secret must give the employer an advantage over

---

[57] O'Hara Aff. ¶ 5.
[58] Harron Aff. ¶¶ 4, 7, 9; Ayres Aff. ¶¶ 7, 8, 9, 13; Annual Report at 70, 71.
[59] Note that Massachusetts law recognizes no meaningful distinction between "trade secrets" and "confidential business information." *See Jet Spray Cooler, Inc. v. Crampton*, 377 Mass. 159, 165 (1979); *Chomerics, Inc. v. Ehrreich*, 12 Mass. App. Ct. 1, 10 n.17 (1981).
[60] *See* Plaintiff's Motion for Preliminary Injunction ¶ 2.
[61] *J.T. Healey & Sons, Inc. v. James A. Murphy & Sons, Inc.*, 357 Mass. 728, 737 (1970).
[62] *Healy*, 357 Mass. at 729.
[63] *Id.* at 735.

competitors who don't have the information.[64] The court also held that the employer must show that it took active steps to guard the secrecy of the information.[65]

In this case, USF alleges (without supporting affidavits) that Posin and Tsebetzis "had access to all confidential information concerning USF Territory Managers, including their salary, commission and other employee-related information."[66] But it fails to explain how this information gives USF a competitive advantage or how their knowledge of it harms USF. Furthermore, USF fails to show any steps it takes to keep secret this or any of its other information.[67] Thus USF has failed to establish that it has any confidential information needing this Court's protection.[68]

Moreover, none of the information that the former employees learned at USF can be of any use to them or to Agar now. According to Ahold's annual report, USF's costs are always changing because of factors like inventory control, severe weather, increases in fuel or transport costs, and the collectibility of accounts receivable.[69] USF provided the employees with updated price lists every week.[70] Thus any pricing information they learned at USF is long outdated. Also, prospective customers freely describe their buying needs to salespeople.[71] This Court recently held that this kind of information gleaned from prospects cannot be protected as confidential business information.[72]

---

[64] *Id.* at 736.
[65] *Id.* at 738.
[66] Plaintiff's Memo. 13
[67] *See id.*
[68] *See Healy*, 357 Mass. at 738.
[69] Annual Report at 21.
[70] O'Hara Aff. ¶ 13; Gross Aff. ¶ 8.
[71] Posin Aff. ¶ 8.
[72] *Oxford Global Resources, Inc. v. Guerriero*, No. 03-12078-DPW, 2003 U.S. Dist. LEXIS 23503, at *25 (Dec. 30. 2003) ("[I]nformation about a third party is not confidential if competitors could obtain the same information directly from the third party.")

Because USF has not shown that it needs the nonsolicits to protect confidential business information, the Court should deny the injunction.

## 2. The Court should deny the motion because of USF's unclean hands: USF is guilty of the same conduct it accuses Agar of, and it obtained the nonsolicits with false promises.

USF does not deserve an injunction because it comes to the courthouse with unclean hands. A preliminary injunction to enforce a restrictive covenant is not a matter of strict and absolute right.[73] On the contrary, this Court has called the preliminary injunction an "extraordinary equitable remedy,"[74] and the First Circuit has described it as a "drastic procedure."[75] It is more than just an axiom that "he who seeks equity must do equity."[76] According to the First Circuit, a person asking the Court to do equity must "come with clean hands."[77] The Massachusetts Supreme Judicial Court has ruled that the purpose of the unclean-hands doctrine is "to prevent a party from benefiting by his dishonesty."[78] As the U.S. Supreme Court has said, the doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."[79] Thus a party seeking equitable relief must have "acted fairly and without fraud or deceit as to the controversy in issue."[80]

Noncompete and nonsolicitation lawsuits are subject to this doctrine. For example, in *Salomon Smith Barney Inc. v. Vockel*, Smith Barney sought an injunction against Stewart

---

[73] *See Economy Grocery Stores Corp. v. McMenamy*, 290 Mass. 549, 552 (1935).
[74] *Boston's Children First v. City of Boston*, 62 F. Supp. 2d 247, 253 (D. Mass. 1999).
[75] *International Ass'n of Machinists v. Eastern Airlines*, 826 F. 2d 1141, 1144 (1st Cir. 1987).
[76] *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945).
[77] *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F. 2d 907, 910–912 (1st Cir. 1989).
[78] *Fisher v. Fisher*, 349 Mass. 675, 677 (1965).
[79] *Precision Instrument*, 324 U.S. at 814.
[80] *Id.* at 814–15.

Vockel, a stockbroker who left to work for a competitor and took customers with him, violating a nonsolicitation agreement.[81] A Pennsylvania federal district court denied the injunction because Smith Barney had previously hired Vockel away from another competitor and had instructed him to solicit his old customers in violation of a similar nonsolicitation agreement.[82] The Court held that because Smith Barney had undertaken the same "unconscionable behavior of which it now complains," it had unclean hands and did not deserve the court's aid.[83] A Georgia federal district court reached the same conclusion in *Morgan Stanley DW, Inc. v. Frisby*.[84] Closer to home, in *UBS PaineWebber Inc. v. Dowd*, Judge Allan van Gestel of the Suffolk County Business Session decried the unclean hands of brokerage houses who lure salespeople from their competitors despite nonsolicitation agreements and later seek to enforce similar agreements against their competitors.[85]

Just as in *Vockel*, *Frisby*, and *Dowd*, USF comes to this Court with unclean hands. Like the brokerage houses, USF has engaged in exactly the sort of competitive conduct that it accuses Agar of doing. It has been USF's practice to hire salespeople away from its competitors and then try to lure away their former customers, in spite of any nonsolicitation agreements they might have had with their former employers.[86] More specifically, USF hired Jeff Gross from Alliant in 2001 and asked him to identify his former customers and their buying needs despite knowing that he was under a nonsolicitation agreement with Alliant.[87] This activity led Alliant to send Gross the same sort of cease-and-desist letter in April 2001 that USF sent him in September

---

[81] *Salomon Smith Barney, Inc., v. Vockel*, 137 F. Supp. 2d 599, 600 (E.D. Penn. 2000).
[82] *Id.* at 601, 604.
[83] *Id.* at 603–04.
[84] *Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1373 (N.D. Ga. 2001).
[85] *USB Paine Webber v. Dowd*, 2001 Mass. Super. LEXIS 576, slip op. at 1, 3 (denying injunction).
[86] Tsebetzis Aff. ¶ 12; Goffredo Aff. ¶ 4.
[87] Gross Aff. ¶ 1.

2003.[88] Because USF has undertaken the same "unconscionable behavior of which it now complains," it has unclean hands and does not deserve the Court's aid in equity.[89]

Unclean-hands cases are not limited to brokers' nonsolicits. Massachusetts courts have a long tradition of refusing equity to employers who have acted dishonestly or dishonorably. For example, in *Economy Grocery Stores Corp. v. McMenamy*, a grocery store sought to enforce the noncompete of an employee it had fired.[90] The trial court dismissed the employer's claim, citing the humiliating way the company had fired the man.[91] The Supreme Judicial Court affirmed, holding that a "court of equity does not lend its aid to parties who themselves resort to unjust and unfair conduct."[92] Similarly, in *New Boston Systems, Inc., v. Joffe*, a placement agency sought to enforce a noncompete against a former employee.[93] The trial court denied the injunction, in part because the agency concealed its requirement that she sign a noncompete until after she had accepted the job and moved to Boston from St. Louis.[94]

As in *Joffe*, USF used deception to obtain the employees' nonsolicits. Tsebetzis signed his nonsolicit in exchange for options to buy Ahold stock.[95] This was just days before the scandal was made public, rendering those options worthless.[96] Between this and USF's reneging on the $50,000 bonus owed to Tsebetzis, the company's unclean hands should bar it from winning equitable relief against him.[97]

---

[88] Manning Aff. ¶ 4, Letter from Gwenda M. Burkhardt to Jeffrey Gross, Apr. 5, 2001.
[89] *See Vockel*, 137 F. Supp. 2d at 603–04; *Frisby*, 163 F. Supp. 2d at 1380.
[90] 290 Mass. at 550.
[91] *Id.* at 551.
[92] *Id.* at 552 (quoting *Shikes v. Gabelnick*, 273 Mass. 201, 207 (1930)).
[93] No. 93-6343, 1993 Mass. Super. LEXIS 108, at *1–3 (Nov. 28, 1993).
[94] *Id.* at *8.
[95] Tsebetzis Aff. ¶¶ 6–7; Verified Compl. Ex. 1. Posin also signed his nonsolicit in exchange for stock options, but his nonsolicit expired last July. Posin Aff. ¶¶ 1, 4.
[96] Tsebetzis Aff. ¶ 9.
[97] Tsebetzis Aff. ¶ 18; *See Joffe*, 1993 Mass. Super. LEXIS 108, at *8.

Similarly, O'Hara and Gross signed their nonsolicits in exchange for participation in USF's "Points of Focus" commission program.[98] But the program rules state that an employee forfeits any earned commission if he or she resigns from USF.[99] This violates the Massachusetts Payment-of-Wages Act, which makes it illegal for an employer to withhold a commission that has been definitely determined and has become due and payable.[100] In fact, USF withheld about $2000 in due and payable commissions that O'Hara had earned under the program, leading him to file a charge with the Massachusetts Attorney General's Office (which issued him a right-to-sue letter).[101] Again, the company's unclean hands should bar it from winning equitable relief against these employees.

To grant USF's request for extraordinary equitable relief would allow it to benefit from its own dishonesty.[102] Thus the Court should deny USF's motion.

## 3. The Court should deny the motion because USF has not shown that defendants' conduct has caused or will cause it irreparable harm.

USF has failed to show that it will suffer immediate and irreparable harm if the Court denies the injunction.[103] USF's customers and employees are abandoning it in the wake of the scandal; an injunction against the former employees will have no effect on that. USF has not suffered any harm resulting from the former employees' working for Agar, nor has USF offered any evidence that it is likely to. And finally, if USF had truly been in danger of immediate and

---

[98] O'Hara Aff. ¶ 9; Gross Aff. ¶ 4. Points of Focus is a program that allows employees to earn commission points that can be redeemed for valuable goods and services by selling a particular vendor's products.
[99] Manning Aff. ¶ 3, Points of Focus Program Rules ¶ 4.
[100] Mass. Gen. L. ch. 149, § 148.
[101] Manning Aff. ¶ 7, Letter from Attorney General's Office to O'Hara, Jan. 27, 2004.
[102] *See Fisher*, 349 Mass. at 677.
[103] *See Packaging Industries Group, Inc. v. Cheney*, 380 Mass. 609, 671 (1980).

irreparable harm, it would not have waited so long to seek an injunction. For these reasons, the Court should deny USF's motion.

USF cannot show that it needs an injunction to prevent immediate and irreparable harm. As discussed in the goodwill section above, USF has hoisted itself by its own petard.[104] Ahold's annual report frankly catalogs the reputational damage that USF has inflicted on itself.[105] And USF has failed to show that the former employees have taken any confidential business information that could harm it.[106]

What is more, USF has failed to show that it has already suffered irreparable harm at the hands of the former employees. USF complains about losing the business of Kelly's Roast Beef and Corporate Chefs, but executives of those customers have testified that they left because of USF's higher prices and poor service, not because they were solicited by Tsebetzis, O'Hara, or Gross in violation of their nonsolicits.[107] In fact, Kelly's COO Kevin Harron testified that Tsebetzis did not try to solicit his business, and that he explained this to Bailey before this motion was filed.[108] At best, USF has speculated that it could suffer harm. But speculation or unfounded fears of what may happen in the future cannot provide the basis for a preliminary injunction.[109]

The former employees have not been unfairly competing with USF or causing it irreparable harm. Posin has not been bound by his nonsolicit since his agreement expired in July 2003.[110] Gross and Tsebetzis have not solicited any of their former customers, nor have they

---

[104] See the discussion at Part 1.A above.
[105] Annual Report at 11.
[106] See the discussion at Part 1.B above.
[107] Harron Aff. ¶ 9; Ayres Aff. ¶¶ 12–13.
[108] Harron Aff. ¶ 7.
[109] *In Re: Rare Coin Galleries*, 862 F. 2d 896, 902 (1st Cir. 1988).
[110] Verified Complaint Ex. 2.

15

solicited any other USF employees to come to work for Agar, notwithstanding USF's unsubstantiated rumors and hearsay.[111]

While it is true that O'Hara did contact two of his former customers (Bella Luna and Buff's Pub), he did not sell anything to either of them.[112] He had thought they were fair game because he had not done any business with either of them since more than a year before he left USF.[113] He also contacted Hanscom Air Force Base to find out when their ten-year public contract was up for rebidding.[114] While talking with O'Hara, the Hanscom people expressed dissatisfaction with USF's service and asked if he could provide them with a particular meat product that USF could not provide.[115] This led to two small orders generating a net profit of only $100.[116] (Moreover, Agar had been doing business with Hanscom since before O'Hara arrived.[117]) Otherwise, O'Hara has not sold any product to his former USF customers.[118]

Finally, the Court should disbelieve USF's fears of immediate, irreparable harm because of the unjustifiable delay between the former employees' moves to Agar and this motion. USF knew that the employees were leaving to go to work for Agar.[119] Posin left in July 2002, a year and a half before USF filed this motion. Tsebetzis and O'Hara went to Agar in the spring of 2003, eight or nine months before this motion, and Gross joined Agar four months before the motion was filed. If USF believed it was truly in danger of immediate and irreparable harm, it should have filed this motion months ago. As USF's counsel Laurence Reece wrote in his highly

---

[111] Ayres Aff. ¶ 13; Harron Aff. ¶ 9; Tsebetzis Aff. ¶ 22–23; Gross Aff. ¶¶ 9, 12; McDonald Aff. ¶¶ 5–6 (attached as Ex. P).
[112] O'Hara Aff. ¶ 12.
[113] *Id.*
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] Manning Aff. ¶¶ 5–6.

regarded book, *Negotiating, Drafting and Enforcing Noncompetition Agreements*, "If the employer promptly commences a lawsuit, this signals the court and the opposing parties that the employer is serious about enforcing its legal rights and prevents the opposing parties from arguing laches or mootness."[120] Thus the Court should refuse to grant the injunction because USF cannot show that it is serious about facing immediate, irreparable harm.

In summary, the balance of harms favors the former employees. USF is losing customers because of its scandals, high prices, and poor service; not because of the former employees' conduct. Granting the injunction will not solve these problems: in fact, a former USF customer has testified that if it is kept from doing business with Agar, it still will not return to USF.[121] But if the Court enjoins Agar and the former employees from servicing those customers, the defendants will suffer lost revenue and commissions.[122] Because the balance of harms favors the defendants, the Court should deny USF's motion.

## Conclusion

The Court should deny USF's motion for preliminary injunction for three reasons:

- USF's nonsolicitation agreements do not protect goodwill or confidential business information.
- USF has come to the courthouse with unclean hands.
- USF cannot show that it faces imminent, irreparable harm.[123]

---

[120] Laurence H. Reece III, *Negotiating, Drafting and Enforcing Noncompetition Agreements* 35 (MCLE 1997).
[121] Ayres Aff. ¶ 13.
[122] O'Hara Aff. ¶¶ 14–15; Gross Aff. ¶ 13; Tsebetzis Aff. ¶ 25.
[123] A note on Rule 65(c) security: While defendants believe the Court should deny the injunction, if the Court chooses to grant it, defendants argue that USF should be required to post a bond equivalent to the estimated amount of business Agar would lose and the commissions the former employees would lose if the injunction were found to be wrongfully granted. If the Court does grant the injunction, defendants would request 24 hours from that time to calculate this estimate.

Respectfully submitted,

Arthur Tsebetzis, Steven Posin, John J. O'Hara, Jeffrey E. Gross,

By their attorneys,

_____
Jay Shepherd (BBO# 567844)
Lurleen A. Manning (BBO# 655109)
Shepherd Law Group, P.C.
99 Summer Street, Suite 910
Boston, MA 02110-1248
Telephone: 617.439.4200
Facsimile: 617.439.4207

and Agar Supply, Inc.

By its attorneys,

_____
Susan Grandis Brander (BBO# 206870)
Richard E. Gentilli (BBO# 189080)
Thomas M. Looney (BBO# 555040)
Bartlett Hackett Feinberg P.C.
10 High Street, Suite 920
Boston, MA 02110
Telephone: 617.422.0200
Facsimile: 617.422.0383

Dated February 3, 2004

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand) (mail) on February 3, 2004.