UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| U.S. FOODSERVICE, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>ARTHUR TSEBETZIS, STEVEN POSIN, JOHN J. O'HARA, JEFFREY E. GROSS, and AGAR SUPPLY, INC.,<br><br>    Defendants. | Civil Action No. 03-12603-RCL |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendants' opposition contains a curious assortment of admissions and denials. Although they claim they are adhering to their agreements, Defendants admit certain violations, do not deny others, and then assert a litany of purported excuses, mostly focused on alleged misconduct by USF, as to why they contend they may freely breach their agreements with U.S. Foodservice, Inc. ("**USF**").

Defendants argue that they are free to breach their agreements because, they assert, USF's goodwill has been destroyed as a result of allegations of accounting fraud; USF's business information is not confidential; and there was no consideration for the agreements. Defendant Jeffrey Gross also advances the remarkable argument that he should be excused from violating his USF agreement because he had previously violated an agreement with a prior employer.

As set forth below and in the accompanying Reply Declarations of David Bailey, Tom McGettigan, Michael Contarino, Chris Daly and Steven Cifrino, these defenses are not supported by fact or law, and Defendants' claim that they are adhering to agreements that they admit violating and also strenuously urge are unenforceable is simply not credible. Defendants have breached their

agreements with Defendants Posin's and Agar's assistance. Accordingly, USF is entitled to injunctive relief.

## Point I
## USF's Goodwill Is a Legitimate Business Interest
## Supporting Enforcement of the Covenants

Defendants Arthur Tsebetzis, Steven Posin, Jeffrey Gross, and John O'Hara (collectively, the "**Former Employee Defendants**") do not dispute that USF paid them to establish business relationships and goodwill with certain USF customers by developing an intimate knowledge of those customers' service and pricing needs. Nor do they dispute that Massachusetts courts recognize a business' legitimate interest in protecting a company's reputation and relationships with its customers. *Modis, Inc v. Revolution Group, Ltd.*, No. 991104, 1999 WL 1441918 (Mass. Super. Ct. Dec. 29, 1999).[1] Goodwill includes the business' expectancy "of continued patronage from its customers." *In re Corrugated Paper Corp.*, 185 B.R. 667, 670 (Bankr. D. Mass. 1995). The goodwill belongs to the company that pays its employees to develop the customer relationships. *See, e.g., Equipment & Systems For Industry, Inc. v. Zevetchin*, 864 F. Supp. 253, 257 (D. Mass. 1994) (finding employee's prior business with customer does not exempt that customer from non-solicitation obligations because it was the employee's responsibility "to attract new clients and manufacturers" for the new employer).

Defendants assert, however, that USF's goodwill has been destroyed by allegations of accounting irregularities. That assertion is unfounded. USF's strong relationships have enabled USF to remain a strong competitor in the industry, and its goodwill – while harmed and under attack by Defendants' ongoing violations – has not been destroyed by the investigation. *See* Bailey Reply Decl., attached as **Exhibit G**, ¶ 5. Significantly, neither of the two customers who have submitted affidavits in this case, Kelly's Roast Beef and Corporate Chefs, state they switched their business to Agar because of the accounting investigation. *Id.* at ¶ 4. USF and its Boston Division have in fact increased

---

[1] Defendants concede that Massachusetts and Maryland law governing restrictive covenants is essentially the same. Defs.' Opp'n at 6 n.38. Thus, USF's Reply Memorandum applies Massachusetts law.

their sales and customer base over the past year and have a continued expectancy of business from current and new customers. *Id.* at ¶ 5. The investigation – with which USF is cooperating fully – has clearly not destroyed USF's relationships with its customers.[2] USF is entitled to protect its goodwill by enforcing the agreements.

If the Court were to adopt Defendants' argument, before enforcing any non-solicitation/ non-service agreement a court would have to conduct an opinion poll to see whether the plaintiff was well regarded. The question of such an agreement's enforceability is not, however, to be determined by a popularity contest. If it were, any time a company was the subject of an investigation or negative publicity that has no relationship to the contracts at issue, parties to a contract with that company could freely ignore their contractual obligations. This is not the law. Even in an area of law where a plaintiff's reputation is more clearly at issue – libel law – the courts have been loathe to find that a plaintiff's reputation is so bad that he cannot assert the defendant's acts are causing him harm. *See, e.g., Guiccone v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir. 1986). Moreover,

> [T]he libel proof plaintiff doctrine does not . . . prevent the imposition of liability merely because the person allegedly defamed already has a bad reputation. In order to be shielded from liability, the statement [at issue] must deal with the same matters upon which the person's bad reputation is founded.

*Schiavone Constr. Co. v. Time, Inc.*, 646 F. Supp. 1511, 1516 (D.N.J. 1986) *aff'd on these grounds*, 847 F.2d 1069 (3d Cir. 1988); *see also Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 (D.C. Cir. 1984) (rejecting "assumption that one's reputation is a monolith, which stands or falls in its entirety"). By the same token, an uncompleted investigation into alleged accounting violations does not relieve the Former Employee Defendants of their contractual obligations not to solicit or serve a limited group of customers, use or disclose confidential information, or recruit USF employees.

---

[2] Boston USF personnel have not been implicated in the investigations. Bailey Reply Decl., ¶ 3. Further, Defendants' claim that USF has been sued by the Massachusetts Department of Corrections is untrue. *Id.* at ¶ 26.

## Point II
## The Agreements Are Supported By Consideration

In another effort to avoid their contractual obligations, Defendants Arthur Tsebetzis, John O'Hara and Jeffrey Gross claim that they did not receive valid consideration to enter into their agreements. Mr. Tsebetzis complains that the stock options[3] he was granted when he signed the new agreement were "worthless", and Mr. O'Hara complains that he did not exercise all of his points under the Points of Focus Program. These defendants ignore the fact, however, that they were each given and received a valuable opportunity — Mr. Tsebetzis was given the opportunity to exercise stock options which would vest in the future and Messrs. O'Hara and Gross were given the opportunity to obtain points which they could (and did) redeem for valuable merchandise. Bailey Reply Decl., ¶ 12. Courts have held that the opportunity for such benefits constitutes consideration for restrictive covenants. *See, e.g., Universal Hosp. Servs. v. Hennessy*, No. 01-2072 (PAM/JGL), 2002 U.S. Dist. LEXIS 2138, at *9 (D. Minn. Jan. 23, 2002); *Oxford Global Resources, Inc. v. Guerriero*, No. 03-12078-DPW, 2003 U.S. Dist. LEXIS 23503, at *37 (D. Mass. Dec. 30, 2003). The fact that neither employee chose to stay and enjoy the full benefit of the consideration they were granted does not render their contracts void.[4]

Moreover, Messrs. Tsebetzis and Gross were already bound by prior non-solicitation agreements when they signed their most recent agreements. Bailey Reply Decl., ¶ 7. Thus, they did not need new consideration to continue their existing obligations.[5]

---

[3] The stock options provide the employee with the opportunity to purchase American Depository Receipts, negotiable U.S. Certificates representing ownership shares in Royal Ahold, a non-U.S. corporation.

[4] Mr. Tsebetzis's complaint that USF's stock price dropped after he signed his agreement is irrelevant. The options became exercisable in the future, not at the date of grant, and Mr. Tsebetzis was given the opportunity to benefit from any future gain. *See* Verified Compl. at Ex. 1. As a matter of fact, after an initial decline, USF's stock prices have steadily increased. Bailey Reply Decl., ¶ 10. Surely Mr. Tsebetzis would not argue that had the stock price increased immediately, USF would be entitled to extend the term of his agreement.

[5] Messrs. O'Hara and Gross incorrectly refer to the points as commissions. As Massachusetts courts have made clear, additional benefits awarded in a program such as USF's Points of Focus Program are governed by the program's terms and not the Massachusetts Wage Act. *See Cumpata v. Blue Cross Blue Shield of Massachusetts, Inc.*, 113 F. Supp.2d 164, 168 (D. Mass. 2000) (holding benefits dictated by a sales incentive plan constitutes "compensation 'triggered by contingencies' and thus outside the scope of the Wage Act").

### Point III
### USF's Conduct Does Not Bar Equitable Relief

Defendants next assert that USF comes before the Court with unclean hands. Defendants, however, fail to establish that defense as a matter of law or fact. As the cases that Defendants cite in their opposition papers make clear, the unclean hands doctrine only "closes the doors of a court of equity to one tainted with inequitableness or bad faith *relative to the matter in which he seeks relief.*" *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815 (1945) (emphasis added); *Salomon Smith Barney Inc. v. Vockel*, 137 F. Supp.2d 599 (E.D. Pa. 2000) ("We are not to consider misconduct that has no connection to the case at hand. Rather, any 'unconscionable act' of the plaintiff must have 'immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.'"). Moreover, a party's conduct must be particularly egregious to warrant application of the unclean hands bar. *Oxford Global*, 2003 U.S. Dist. LEXIS 23503, at *37 (finding plaintiff's "isolated misstep" in directing another employee to impersonate both a contractor and client to disrupt one of defendant's placements and to destroy that defendant's relationship with both was not "a complete license to solicit their former clients.").

The fact that an accounting investigation has been commenced relating to USF's alleged financial activities at corporate headquarters has no bearing on whether or not USF's Boston-Everett division acted properly with regard to the agreements at issue. Nor does the fact that USF did not pay Mr. Tsebetzis a bonus that he did not earn or that USF did not permit Defendants O'Hara or Gross to exercise points in violation of the terms of the Points of Focus Program mean that USF has unclean hands. USF gave those individuals what the bonus and Points of Focus program required – no more and no less. *See* Bailey Reply Decl., ¶¶ 8-12.

Finally, Defendant Jeffrey Gross now urges, in essence, that because he violated a non-solicitation agreement with a prior employer when he joined USF, he should be excused from honoring the one at issue in this case. If anyone acted improperly in the past, however, it was Mr. Gross

himself, not USF. USF instructed Mr. Gross to honor his agreement with his previous employer, and he assured USF on several occasions that he was doing so. He was cautioned that his employment would be terminated if he violated his agreement. *See* McGettigan Reply Decl., attached as **Exhibit H**, ¶¶ 2-11. USF has a clear policy of instructing its new-hires to honor their prior agreements. *See* Bailey Reply Decl., ¶¶ 15-17. That policy has been followed in Boston. If Mr. Gross now claims he violated his prior agreement, that is news to USF. It is, certainly, a reason to distrust his current claims that he did not breach his agreement with USF. *Cf.* Daly Reply Decl., attached as **Exhibit I**, ¶¶ 3-5 (controverting Gross' claims). It is not however, a reason to let him out of his current agreement.[6]

### Point IV
### Defendants' Improper Servicing of USF Customers and Recruitment of USF Employees Irreparably Harms USF

**A.    Defendants' Improper Conduct**

Defendant John O'Hara frankly admits that he has solicited USF customers that he is prohibited from serving. He apparently feels free to do so because, he says, the sales to date to those accounts have been minimal. *See* Individual Defs.' Ans., ¶ 47; Defs.' Opp'n at Ex. E, ¶ 12.[7] But neither the agreements nor the law provide that he may violate his agreement as long as he is not very successful in doing so. And Mr. O'Hara makes it clear that absent an injunction he does not intend to stop his efforts to pursue more business from these customers. *See* Defs.' Opp'n at Ex. E.

As for the other defendants, while they state they did not solicit certain customers or recruit USF employees, matters that are in dispute, *see* Contarino Reply Decl., attached as **Exhibit J**, ¶¶ 2-3; Daly Reply Decl., ¶¶ 4-5,[8] they do not say that they are not *servicing* or *receiving business* from any of

---

[6] Contrary to Defendants' claims, Mr. Bailey has never pursued or encouraged employment with Sysco Hallsmith for either himself or Mr. Tsebetzis. Bailey Reply Decl., ¶ 27.
[7] Mr. O'Hara incorrectly claims in his affidavit that his last contact with Buffs Pub on USF's behalf was in April 2002. Mr. O'Hara last sold to Buffs Pub on September 4, 2002. *See* Bailey Reply Decl., ¶ 29. Thus, under the terms of his agreement, Mr. O'Hara is not permitted to solicit or serve Buffs Pub until April 2004.
[8] Defendant Tsebetzis does not deny that he is serving Century House in violation of his agreement.

the customers at issue, nor do the customers. Yet, to prevent a "he said/she said" dispute and to prevent the need to embroil customers in litigation to enforce the agreements, the agreements at issue prohibit both soliciting *and* serving USF's customers, whether directly or indirectly. *See* Verified Compl. at Ex. 3, ¶ 6; *see also* Verified Compl. at Ex.1, ¶ 3; Ex. 2, ¶ 2(b); Ex. 4, ¶ 6.

The Former Employee Defendants' servicing of USF's customers to enable Agar to build relationships with those customers is just as harmful to USF as if they made the initial solicitation because it puts USF's goodwill and confidential information to work for Agar. Thus, Mr. Tsebetzis' repeated allegations that he did not *initiate contact* or that he is not *involved* in certain meetings does not insulate him from his contractual violations. *See Custard Ins. Adjusters, Inc. v. Nardi*, No. CV980061967S, 2000 WL 739642, at *1 (Conn. Super. May 22, 2000) (enforcing a similar contract under Massachusetts law and enjoining defendants from soliciting and servicing certain customers, which "would result whether the business came by way of solicitation or acceptance of business without solicitation").

Moreover, Defendants cannot circumvent the non-solicit and non-serve provisions of their agreements by assisting other Agar employees in acquiring business from their former customers. Yet that is exactly what they are doing. Kevin Harron, the Chief Operating Officer of Kelly's Roast Beef, states that when he called Mr. Tsebetzis at Agar, Mr. Tsebetzis put him in contact with Mr. Bud Lomastro. *See* Defs.' Opp'n at Ex. M, ¶ 5. That was a violation of Mr. Tsebetzis' agreement. And Mr. Tsebetzis and Mr. Lomastro met with Michael Contarino to recruit him to work for Agar, Contarino Reply Decl., ¶ 4, indicating they also wanted to acquire Kelly's Roast Beef for Agar as a customer. Now Bud Lomastro is handling the Kelly's Roast Beef account for Agar. Defs.' Opp'n at Ex. M. Mr. Tsebetzis is not permitted to assist Mr. Lomastro to acquire off-limits accounts. Similarly, the Former Employees Defendants' may not circumvent their agreements by working with Steve Posin, another former USF employee, to attract business for Agar from accounts they are not permitted

to serve. Their efforts to do so constitute indirect solicitation explicitly prohibited by the agreements at issue, which provides:

> The prohibition against indirectly soliciting, marketing, selling to or contacting any Customers as set forth above means that Optionee shall not, without limitation: provide information to any Person (other than USF) regarding any such Customer; introduce any Person (other than USF) to any such Customer; advise, suggest to or encourage any such Customer that it should do business with any Person (other than USF); "switch" or "swap" sales, solicitation, or service responsibility for any Customers with any other former employee of USF; participate in the supervision or management of any of the accounts of any such Customer; participate in the setting of prices, credit terms or margins for any such Customer; participate in the strategies and decisions affecting any such Customer.

Verified Compl. at Ex. 1, ¶ 3(b). *See Custard Ins. Adjusters, Inc.*, 2000 WL 739642, at *1; *see also* prior decision in *Custard Ins.*, 2000 WL 562318, at *1 (Conn. Super. April 20, 2000).

Finally, courts will enforce non-solicitation obligations even against a third-party to the agreement where the stranger to the contract is switching or trading customer lists or acquiring confidential information from others bound by duties of confidentiality. *See, e.g., Sysco Food Services of Atlanta, Inc. v. Chupp*, 484 S.E.2d 323, 326-27 (Ga. Ct. App. 1997) (enforcing restrictive covenant against two former employees who indirectly solicited former customers by trading customer lists with each other); *Sulmonetti v. Hayes*, 347 Mass. 390 (1964) (enjoining wife from operating fuel oil business or soliciting customers to that business where husband had signed a 10-year non-compete upon the sale of fuel oil business). Thus, as a result of the actions to date, Steve Posin should be enjoined from continuing to serve the customers he has served in tandem with the employees still bound by their agreements, and Agar should be similarly enjoined as described in the modified proposed order.

**B.     Defendants' Improper Use and Disclosure of USF's
        Confidential Information Irreparably Harms USF**

Defendants deny that they are using or disclosing USF's confidential information. That denial rings hollow, because they also allege that USF does not possess confidential information deserving of

protection.[9] In so arguing, they ignore that the Former Employee Defendants collectively signed a total of eight contracts acknowledging that USF possesses protectible confidential information and agreeing not to use it or disclose it in the future to competitors. *See* Verified Compl., Exs. 1-4; Bailey Reply Decl. at Ex. 1, ¶ 2; Ex. 2, ¶ 2(a); Ex. 3, ¶ 2; Ex. 4. In addition, Defendants focus on the potentially ephemeral nature of pricing to dispute the confidential nature of USF's business information and do not address or challenge the confidentiality of information beyond USF's price structure. The Former Employee Defendants were privy to a whole range of USF's sensitive business information, including strategic sales, customer preference information and servicing, marketing and service plans, and policy decisions. *See* Bailey Aff., Ex. B to Mot. for Preliminary Injunction, ¶¶ 6-14. USF's goodwill derives from this information, and it is essential to serving customers such as Corporate Chefs and Kelly's Roast Beef. Despite their denials, Defendants are now exploiting that confidential information and those relationships for the benefit of themselves and their new employer, Agar. *See, e.g.,* Cifrino Reply Decl., attached as **Exhibit K** (explaining Tsebetzis' and Posin's use of confidential information to bid for Boston College's business).[10]

Further, Defendants quote language from *Oxford Global* out of context to support their denial that USF's information is confidential. *See* Defs.' Opp'n at 10 n.73. In *Oxford Global*, however, there was no dispute that "Oxford's database of contractors and corporate clients, including such information as rate information, availability, and skill sets, is confidential." 2003 U.S. Dist. LEXIS 23503, at *24. *Oxford Global* did not hold as a matter of law that information that can be learned through discussion with customers is undeserving of protection. The fact that the former employer spent the time necessary to assemble the information gives a competitive advantage and points to the information's

---

[9] Defendants' argument that USF alleges "without supporting affidavits" that USF's business information is confidential ignores the Mr. Bailey's affidavit explaining the nature of USF's confidential information, how it is developed, why it is valuable, and how it gives USF a competitive edge. *See* Bailey Aff., Ex. B to Mot. for Preliminary Injunction, ¶¶ 6-14.

[10] Mr. Tsebetzis' contention that he did not take any files or any of USF's confidential information is not true. His office credenza which had previously contained many files were empty when he left. Bailey Decl., ¶ 31.

protectability. Further, the court noted that the ease with which a former employee could use his memory of a particular customer to then locate that customer's information through public sources merits enforcement of the restrictive covenant to prevent such unfair advantage. *Id.* at *27-28 & n.8.

Finally, defendants' contention that there was an unreasonable delay in bringing this action that precludes a finding of irreparable harm is disingenuous. Upon learning of various violations, USF immediately demanded that the Former Employee Defendants cease violating their agreements. *See* Verified Compl., Ex. 5. USF became aware of further violations in November and December 2003, as well as the loss of business from two long-standing USF customers, Corporate Chefs and Kelly's Roast Beef. USF then filed this action seeking injunctive relief. A delay is not unreasonable where it is necessary "to bring a well-founded motion for a preliminary injunction." *See Oxford Global*, 2003 U.S. Dist. LEXIS 23503, at *34; *see also Alexander & Alexander, Inc. v. Danahy*, 488 N.E.2d 22 (Mass. App. Ct. 1986) (holding 17-month delay in bringing suit justified by former employee's assurances to comply with restrictive covenant and attempts to negotiate terms of restrictive covenant).

## CONCLUSION

The Former Employee Defendants are working with other Agar employees to violate their agreements and divert USF customers goodwill and confidential information to Agar. USF is suffering and will continue to suffer immediate, substantial and irreparable harm in the form of lost clients and lost goodwill injury if its request for injunctive relief is denied. By contrast, Defendants will remain free to serve thousands of other restaurants in the Boston area if Plaintiff's request is granted.[11] For the foregoing reasons, plaintiff respectfully requests that the Court grant USF's motion for a preliminary injunction.

---

[11] Because USF seeks to limit the Former Employee Defendants from dealing with a small subset of customers for whose business USF and Agar compete in the Boston area, *see* Bailey Aff., Exhibit B to Mot. for Preliminary Injunction, ¶ 5, neither the Former Employee Defendants nor Agar will suffer any compensable harm requiring the issuance of a bond pursuant to Fed. Rule Civ. P. 65(c).

RESPECTFULLY submitted this ___19___ day of February, 2004.

                                  U.S. FOODSERVICE, INC.
                                  By its attorneys,

                                  _/s/ Alana Prills_____
                                  Laurence H. Reece, III
                                  BBO# 414460
                                  Alana A. Prills
                                  BBO# 652881
                                  REECE & ASSOCIATES, P.C.
                                  One Bowdoin Square
                                  Boston, Massachusetts 02114
                                  (617) 747-7550

*OF COUNSEL*:
Victoria A. Cundiff
Rebecca Kelder Myers
Danielle M. White
PAUL HASTINGS JANOFSKY & WALKER LLP
75 E. 55th Street
New York, New York 10022
(212) 318-6000