UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-12603-RCL

U.S. FOODSERVICE, INC.,
Plaintiff

v.

ARTHUR TSEBETZIS,
STEVEN POSIN,
JOHN J. O'HARA,
JEFFREY E. GROSS, and
AGAR SUPPLY, INC.,
Defendants

**REPORT AND RECOMMENDATION ON
THE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
(Docket #9)**

ALEXANDER, M.J.

This breach of contract and tortious interference case was filed initially in Massachusetts state court and, pursuant to 28 U.S.C. 1441, subsequently removed to the United States District Court for the District of Massachusetts on or about February 6, 2004. It is currently before this Court pursuant to an Order of Reference requesting a Report and Recommendation on the motion for a preliminary injunction by the plaintiff, US Foodservice, Inc. ("USF"). This Court held a hearing on the motion on March 1, 2004 and has considered carefully the legal memoranda, affidavits, and exhibits submitted by the parties. For the reasons set forth more fully below, the Court RECOMMENDS that the plaintiff's motion be DENIED.

**RELEVANT BACKGROUND**

USF is in the business of supplying ("buying, selling and delivering") food and related products to various customers, including restaurants, schools, offices, and hospitals. USF is a large corporation that does business nationally, including the Boston area. USF avers that from a "vast universe" of potential customers, it used substantial time, effort and expense to "develop[] business relationships and goodwill with particular customers and [] develop[] strategies for meeting the needs of those customers so that it can better service them." According to USF, its various efforts and strategies to solicit, recruit, and maintain its customers are valuable confidential and proprietary information.

Within the Boston/Everett division of USF's market, USF employs "territory managers," who spend most of their time on the road working face-to-face with customers, filling orders, and building and maintaining favorable customer relations. The defendants John O'Hara ("Mr. O'Hara") and Jeffrey Gross ("Mr. Gross") were employed by USF as territory managers prior to the commencement of this action.

Territory managers are supervised by "executives" who, in addition to supervising territory managers, are responsible for developing new business and maintaining old business by direct customer contact. USF alleges its executives have "comprehensive and deep knowledge" about USF and its business strategies, as well as "intimate familiarity" of USF's clients. The defendants Arthur Tsebetzis ("Mr. Tsebetzis") and Steven Posin ("Mr. Posin") were employed previously by USF as executives.

In connection with their employment, all of the above-named individual defendants (collectively, "the Former Employee Defendants") signed agreements (collectively, "the Agreements" or individually, "the Agreement") with USF.  In pertinent part, the Agreements provide that, for a period of one year after termination from USF's employment, no former USF employee shall, directly or indirectly, "contact, solicit, sell to" any USF customer or potential with whom the former USF employee had contact during the last eighteen months of his employment with USF, or about whom they learned confidential information while in USF's employment.  In the case of former USF employees with supervisory responsibilities (such as Mr. Posin and Mr. Tsebetzis), the contract extends the scope of the supervisor's "contact with customers" to include those customers with whom any of their supervisees had contact.

The Agreements also provide that the former USF employees shall not induce or solicit current USF employees to end their employment at USF or to accept employment at any USF competitor.  Further, the Agreements proscribe the use, disclosure, and possession of any confidential USF information at any time after termination.

Agar Supply, Inc. ("Agar") is a smaller company that competes with USF in the Boston market.  The Former Employee Defendants all left USF's employ and were hired by Agar[1] thereafter.   USF contends that Mr. Posin and Mr. Tsebetzis induced Mr. O'Hara

---

[1]It seems undisputed that Mr. Tsebetzis left USF's employment on or about April 11, 2003 and began work at Agar on or about May 5, 2003, and that Mr. Gross resigned from USF on or about September 5, 2003 and was hired by Agar on or about September

and Mr. Gross to resign their positions at USF in favor of positions at Agar.[2] It further alleges that the Former Employee Defendants attempted to solicit other current USF employees to leave USF for Agar. With respect to its claim against Agar, USF avers that Agar was aware of the relevant agreements between USF and Messrs. Posin, Tsebetzis, O'Hara, and Gross, yet allowed such improper inducements to take place.

As detailed more fully below, at various times since the Former Employee Defendants began work at Agar, certain USF customers left USF for Agar. USF asserts these changes are due to improper solicitation, i.e., in violation of the Agreements, by some or all of the Former Employee Defendants. USF further asserts that Agar's servicing ("indirectly selling to") of these customers by the Former Employee Defendants is also forbidden by the Agreements. Among the improper solicitations and service of which USF complains are the following:

1.  Mr. Tsebetzis and Mr. Posin allegedly solicited Corporate Chef, Inc.

---

9, 2003. There is some dispute as to the operative dates of the other individual defendants. Mr. O'Hara was hired by Agar on or about May 27, 2003 after resigning from USF on either May 16, 2003 or May 24, 2003. In that the discrepancy in dates is not material to this motion, the Court need not reconcile it. However, the ambiguity in the date upon which Mr. Posin resigned from USF – at some point between July 11, 2002 and July 15, 2002, *compare* Complaint, ¶ 6 (alleging Mr. Posin left USF's employ on July 15, 2002) with Individually Named Defendants' Answer, ¶ 6 (alleging Mr. Posin resigned on July 13, 2002) and Exhibit D to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction (Docket #26) at ¶ D (averring Mr. Posin resigned on July 13, 2002) – is material insofar as it relates to a particular allegation of breach more fully examined *infra*.

[2] USF also alleges that various Former Employee Defendants contacted other USF employees in unsuccessful attempts to induce them to work for Agar.

      ("Corporate Chef") on Agar's behalf via a "mini food show" at Agar on or about July 16, 2003. Corporate Chef was a customer of USF's, but now uses Agar for its supplies. As both Mr. Tsebetzis and Mr. Posin had contact with Corporate Chef while at USF, USF contends that even indirect selling by Mr. Tsebetzis and Mr. Posin amounts to breach of the Agreements if they participated in the mini food show.

2.     Mr. Tsebetzis allegedly solicited Kelly's Roast Beef ("Kelly's"), a former USF customer, on Agar's behalf. While at USF, Mr. Tsebetzis had contact with Kelly's. Insofar as Mr. Tsebetzis solicited Kelly's or indirectly sells or services Kelly's account with Agar, USF claims Mr. Tsebetzis is in breach of his Agreement.

3.     Mr. O'Hara solicited and serviced the Officers' Club at Hanscom Air Force Base with respect to certain steak products that USF allegedly could not provide that customer. Although the larger base is an Agar account, the Officers' Club did business with USF and Mr. O'Hara was involved in that business when employed at USF.

4.     USF raises similar but not as extensively detailed allegations that various other businesses and entities that are USF customers, including Century House, Boston College, the Massachusetts Department of Corrections ("DOC"), Royal Sonesta, Bella Luna, and Buff's Pub, have been solicited by the Former Employee Defendants and/or Agar.

In support of its allegations, USF offers lengthy affidavits from its employees and managers.

    The plaintiff's proffer, however, is met by vigorous denials by Agar and the Former Employee Defendants. In a lengthy affidavit, Mr. Tsebetzis flatly denies soliciting any USF employee, including Mr. O'Hara; any solicitation of customers (including Kelly's and Corporate Chef) that would be barred by the Agreement; and any use or disclosure of confidential information. His affidavit includes exhibits, such an invitation from Boston College to Agar requesting bids for food service and supply

5

contracts at that institution, purporting to show that the solicitation was made by the customer not the former employee.

Similarly, Mr. Posin offers an affidavit in which he explains that he left USF's employment to take a position with a company other than Agar, GFI Premium Foods ("GFI"), and when GFI terminated its sales force, how he then initiated contact with Agar via an individual other than Mr. Tsebetzis. He expressly states that he neither had contact with Mr. Tsebetzis in seeking employment at Agar nor solicited other USF employees to work with Agar. Mr. Posin admits that he had contact with USF customers, including Corporate Chefs, but contends that he did so after the expiration of his Agreement and without the use of any confidential information gleaned from his employment with USF. He reiterates that Mr. Tsebetzis had no role in planning that meeting. Mr. Posin avers that Agar did not solicit business from Boston College or the DOC and that it does not do business with those entities at present.

In similar fashion, Mr. O'Hara denies that he was solicited by Mr. Tsebetzis or had contact with him in pursuing employment with Agar, and denies that he has solicited or recruited any USF employee. He alleges that he didn't take any confidential information from USF upon resigning, that he has not used such information since leaving USF, and that Agar directed him not to seek any of his former (read USF) customers. Mr. O'Hara claims that he refused to do business with former customers that contacted him, including Bella Luna (a restaurant that had signed an USF credit application but which did not

6

purchase product through USF). He admits to contact with Buff's Pub but states the contact was after the expiration of his Agreement; he admits to selling the Officer's Club Black Canyon Angus rib-eyes and sirloin strips, but contends that he did so at the request of the customer, which informed him that USF was unable to provide those products.

Mr. Gross follows suit with a series of denials. He attests that he contacted Agar regarding employment and in doing so had no contact with Messrs. Tsebetzis and Posin or any other former USF employee. He denies the possession, sharing or direct use of confidential information, and the solicitation and recruitment of USF employees and customers. He avers that Agar advised him to have no contact with his former customers until after the expiration of his Agreement, and that he has not had such contact.

The Court is also presented with other affidavits from non-parties. For example, the treasurer of Corporate Chef, Alan M. Ayres, attests to the reasons for Corporate Chef's defection from USF to Agar (including customer service and pricing issues). In so doing, he explicitly denies that Messrs. Tsebetzis and Posin or any other former USF employees were involved in that process, including the food show at Agar's headquarters. In another, Mr. Kevin Harron, the chief operating officer at Kelly's, denies that he was solicited by Mr. Tsebetzis or any former USF employee for Kelly's business. Indeed, Mr. Harron not only attests that Mr. Tsebetzis refused to speak to him about the account because of the Agreement, but further, that he (Mr. Harron) directly informed USF sales employees and management that neither Mr. Tsebetzis nor any other former USF

employee was involved in that decision.³  An affidavit by an Agar vice-president, Daniel McDonald, reiterates many of the foregoing averments, and states explicitly that Agar did not recruit or solicit any of the Former Employee Defendants to work at Agar.

With this and other information in mind, the Court turns to the legal analysis governing the plaintiff's motion.

**ANALYSIS**

A preliminary injunction shall not issue unless the moving party demonstrates that: (1) there is a likelihood of success on the merits of the underlying claims at trial; (2) the moving party will suffer irreparable harm if the injunction is not granted; (3) that harm

---

³It is undisputed that Kelly's was a USF customer for non-meat needs and that during his tenure at USF, Mr. Tsebetzis was in contact with Kelly's. According to the affidavit of Kevin Harron ("Mr. Harron"), the chief operating officer at Kelly's, in October 2003, Kelly's decided to stop purchasing its meats from its former supplier, James J. Derba, Inc. (a company which is unrelated to Agar and USF) because Mr. Harron thought it best to seek a single provider of meats and groceries. Mr. Harron knew Mr. Tsebetzis while Mr. Tsebetzis was at USF, and also knew Mr. Tsebetzis had gone to work with Agar. Mr. Harron contacted Mr. Tsebetzis by phone at Agar to solicit a bid.

Immediately upon receiving the phone call, Mr. Tsebetzis informed Mr. Harron that he was prohibited from doing business with Kelly's because of the Agreement, and transferred the call to another Agar employee, identified as Bud Lomastro ("Mr. Lomastro"). Subsequently, Mr. Harron decided to purchase all of Kelly's meats and groceries from Agar. Mr. Lomastro handles the account.

USF contends that the telephone contact between Mr. Harron and Mr. Tsebetzis, and subsequent transfer to Mr. Lomastro amounts to breach of the Agreement. The Agreement prohibits Mr. Tsebetzis from "advis[ing], suggest[ing], or encourag[ing] any [USF] customer that it should do business with" Agar. Given the perfunctory and content-neutral nature of the communication between Mr. Tsebetzis and Mr. Harron, it cannot be said that USF has met its burden of proving likelihood of success on the merits of the breach of contract claims with regard to this customer.

outweighs any harm that the nonmoving party would suffer were the injunction to issue; and (4) the public interest would not be adversely affected if the injunction issues. Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995). Although each factor is important and must be considered in its own right, the *sine qua non* of a preliminary injunction is the likelihood of success on the merits. Demers v. Leominster School Dep't, 96 F. Supp.2d 55, 58 (D. Mass. 2000), *citing* Weaver v. Henderson, 984 F.2d 11, 12 n. 3 (1st Cir. 1993). *See also* Abbot Laboratories v. Selfcare, Inc., 17 F. Supp.2d 43, 46 (D. Mass. 1998).

The standards governing the issuance of a preliminary injunction are to be applied in conjunction with the underlying claims in this case, the purported breaches of contracts by the Former Employee Defendants and the tortious interference claimed against Agar and Mr. Posin. The Court addresses them in turn.

### The Breach of Contract Claims

Per a choice of law clause in the terms of the Agreements, the Agreements are to be governed by Maryland law. At the hearing on the motion, however, the parties agreed that there is no material difference between the law of contracts in Maryland and Massachusetts and that Massachusetts law may be employed.

The Court begins its assessments of the defendants' claims attacking the validity of the contracts themselves. The defendants first suggest that the Agreements were not supported by consideration. This Court is not persuaded. In addition to continued

employment, the Former Employee Defendants were afforded additional consideration: for example, Mr. Posin and Mr. Tsebetzis were offered stock options in USF's parent company; Mr. Gross and Mr. O'Hara were allowed to participate in a bonus program. Adequate consideration appears extant. *See, e.g.,* IKON Office Solutions, Inc. v. Belanger, 59 F. Supp.2d 125, 131 (D. Mass. 1999); Simko, Inc. v. Graymar Co., 464 A.2d 1104 (Md. Ct. Spec. App.), *cert. denied*, 469 A.2d 452 (Md. 1983).

The Court next turns to the nature of the Agreements. The Agreements are enforceable if they protect USF's legitimate business interests, are reasonable in their restriction of Former Employee Defendants' activities in geographic and temporal scope, and are not otherwise injurious to the public. *See, e.g.,* All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974); Becker v. Bailey, 299 A.2d 835, 838 (Md. 1973).

USF identifies its business interests here as the confidential information it possesses about its customers and the customer goodwill it developed with the aforementioned businesses (and others) through the Former Employee Defendants and other employees. Such interests are recognized in the law of Maryland and Massachusetts. *See, e.g.,* New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 673 (1977); Silver v. Goldberger, 188 A.2d 155, 158 (Md. 1963).

Nevertheless, the Former Employee Defendants claim that the putatively confidential information is not confidential and thus outside the scope of the Agreements. Their reasoning begins with the contention that Massachusetts makes no distinction

between "confidential information" and "trade secret," suggesting that USF must identify trade secrets to succeed.  The defendants first attempt to buttress the claim by citing <u>Jet Spray Cooler, Inc. v. Crampton</u>, 377 Mass. 159, 165 (1979) ("The essence of ... wrongful use of trade secrets is ... to disclose or to use without permission confidential information acquired from another.")  Although the phrases "confidential information" and "trade secret" appear in the same sentence, their equivalence cannot be fairly inferred from syntactic concrescence.  *See, e.g.,* <u>New England Canteen Service</u>, 372 Mass. at 673 (the court distinguishing "trade secrets" from "confidential information" in similar context).

Moreover, the term is expressly defined in the Agreements themselves, making clear that:

> 'confidential ... information' includes but is not limited to the following: [USF's] customer routes, books, and customer cards; the route list of any salesman of [USF], [USF's] sales and delivery schedules; customer lists; credit terms and information, including payment records; promotional programs of [USF]; pricing policies, lists and sales allowances and discounts, if any; sales totals of various territories; and any financial information of [USF].

The Former Employee Defendants point out that some of this information, such as pricing policies, cannot be of any use to them because it changes on too rapid a basis.  Similarly, information about a customer's needs that is able to be captured directly from the customer is unlikely to be deemed confidential.  Nevertheless, other information such as customer routes clearly can be used to USF's detriment absent protection by the Agreement, <u>Walker Coal & Ice Co. v. Westerman</u>, 263 Mass. 235, 239 (1928), as might the strategies that USF employed in soliciting its customers and potential customers.

Thus, to the extent that the Former Employee Defendants suggest that the Agreements do not extend to the information USF seeks to protect, the contention fails.

The Former Employee Defendants also attack the notion that USF can protect its customer goodwill through the Agreements. In essence, they aver that there is no goodwill left to protect – that USF's involvement in a major accounting scandal destroyed whatever chimerical goodwill was present previously. Whatever the merit of such a claim, it is not established by the factual record before the Court.

Further, the contention is not necessarily supported by law. Massachusetts, for example, characterizes the phrase "goodwill" to mean "the advantage that accrues to a business on account of its name, location and reputation, which tends to enable it to retain the patronage of its old customers." Murray v. Bateman, 315 Mass. 113, 115 (1943). Maryland law similarly provides that the phrase "goodwill" captures "the probability that the old customers will resort to the old place." Prahinski v. Prahinski, 540 A.2d 833, 839 (Md. App. 1988). Although it is surely possible that some (or even most) of USF's customers took their business elsewhere because of USF's accounting practices, the fact that USF still did *some* business with the customers at issue here suggests that the probability of return business, although perhaps diminished, is extant. Goodwill, by its intangible and esoteric nature, has several manifestations and degrees; it is not an all or nothing proposition. Even a business which is operating at a financial loss can have valuable goodwill. Commissioner of Corporations & Taxation v. Ford Motor Co., 308

Mass. 558, 571 (1941).

Finally, the Court addresses whether the obligations placed upon the Former Employee Defendants by the Agreements are reasonable in terms of time and area. The Court finds that the Agreements are tailored to effect only those interests they are designed to protect. For example, only those USF customers with whom a former employee has had contact is deemed out of bounds by the agreement, and even then only for a year. This time period does not appear unreasonable. *See, e.g.,* Fowler v. Printers II, Inc., 598 A.2d 794, 801 (Md. Ct. Spec. App. 1991); Novelty Bias Binding v. Shevrin, 342 Mass. 714, 718 (1961).

Thus, in sum, the Former Employee Defendants fail to demonstrate that the Agreements are not valid and properly enforceable. That said, however, USF does not at this juncture show that there is a likelihood of succeeding on the merits of its breach of contract claims or that irreparable harm will flow if an injunction does not issue.

USF points to several instances of potential breach, for example the alleged inducement of Messrs. O'Hara, Gross and other to employment at Agar, or the allegedly impermissible solicitation and service of USF customers. After considering fully the plethora of papers filed by the parties, and the cogent arguments offered at the hearing, the Court concludes it is not presented with a sufficient basis to conclude that there is a likelihood of success of the merits and/or that an irreparable harm is present if an injunction does not issue. Simply put, there is a wealth of somewhat hyperbolic

allegations and factual disputes within the dueling memoranda, affidavits and exhibits,[4] but to accept one version of the truth over another would require the Court, at least in the context of this case at this time, "to fling a plank of hypothesis over an abyss of uncertainty. . . ."[5] *See* Gradus v. Hanson Aviation, Inc., 158 Cal. App.3rd 1038, 1056 (1984), *citing* The Collected Short Stories of Edith Wharton (Volume 1), (R.W.B. Lewis, ed.). Although there may be merit in the theories postulated by USF with respect to the

---

[4]The Court notes that while some facts are not in dispute, critical ones are often murky. Rather than clarifying those matters, the parties tend to draw conclusions from the ambiguity – something that rarely portends success in the pursuit of an injunction. For example, the Court notes that the expiration date of the one year period proscribed by Mr. Posin's Agreement is within days of the food show and meeting between Agar and Corporate Chef. Although it would seem that the date of Mr. Posin's termination could be clarified within the span of time that has elapsed since the parties filed these papers, it remains uncertain. Fair enough. But it is not fair to then imply that Mr. Posin breached the Agreement by assisting in preparations for the meeting – an allegation that would require some showing that he 1) actually assisted in preparations that violate the terms of the Agreement and 2) that he did so while the agreement was in force. Even taking USF's assertion about the necessary preparation time of the presentation as true, it remains unclear whether such conduct constitutes a breach as a matter of law because the issue of preparation for competition is the subject of legal debate. *See, e.g.*, Hale Trucks of Maryland, LLC v. Volvo Trucks North America, Inc., 224 F. Supp.2d 1010, 1023 (D. Md. 2002) (an employee's preparation for post-employment competition with his current employer does not violate his fiduciary duties to his employer). Similarly, USF does not persuade the Court that the exchange of pleasantries between Messrs. Tsebetzis and Mr. Ayres in the lobby, in and of itself, constitutes a breach of his Agreement – particularly given the dearth of facts about that meeting.

[5]Aside from the encounter with Mr. Ayres, USF also points to the affidavit offered by Mr. Tsebetzis. In particular, USF invites the Court to infer that because Mr. Tsebetzis denies solicitation but not service, he in fact afforded some service to Corporate Chef. At the hearing in this matter, defense counsel noted that the affidavit expressly denies any direct or indirect work with Corporate Chef. There may or may not be merit to the claim made by USF with respect to Mr. Tzebetzi, but the Court cannot conclude at this time that USF has a *likelihood* of such success.

incidents involving Corporate Chef and Kelly's, that merit is not sufficiently patent at present.

Even in the incidents in which there is no real dispute that there were "technical" breach[6] of the Agreements with respect to other accounts (e.g., the Officers Club at Hanscom), the motion fails. Although the Court *might* conclude that there was reasonable likelihood of success on the merits in these incidents,[7] assuming purely *arguendo* that such a conclusion could be drawn, there remains the salient inquiry of whether the incidents caused or are likely to cause USF irreparable harm. Because single sales (Hanscom) and allegedly impermissible contact that does not result in sales (Buff's Pub, Bella Luna, Boston College, and the DOC) are not established to show sufficient

---

[6] It appears undisputed that Hanscom Air Force Base is (or was) a customer of both USF and Agar; Agar (properly) serves the base as a whole, while USF serves the Officer's Club. Mr. O'Hare is in charge of Agar's account, and he is prohibited from soliciting or serving the Officer's Club by the terms of the Agreement. While doing business on the base, it was brought to Mr. O'Hare's attention that the Officer's Club was interested in purchasing a particular steak from Agar because they could not get that cut of meat from USF. Mr. O'Hare arranged to provide the desired cut of meat to the Officer's Club on a one-time basis. The sale resulted in approximately $100 profit for Agar. Counsel agreed at the motion hearing that Mr. O'Hare's conduct was a breach, though not a material one, of the Agreement.

[7] The Agreement requires that Mr. O'Hare not sell "any product or service that relates to the Business of USF." In this context, the "Business of USF" encompasses only those products which are "sold, offered for sale, developed, commenced, or planned to be sold by USF at any time during [O'Hare's] employment." Whether or not USF sold or planned to sell the particular cut of meat in question during Mr. O'Hare's period of employment is unclear from the record. Thus, there remains some question as to whether the meat in question falls within the "Business of USF."

harm to USF, an injunction is an inappropriate remedy.[8]

Thus, to the extent the plaintiff moves for a preliminary injunction against the Former Employee Defendants on the purported breach of contracts claims, the Court RECOMMENDS that the District Court DENY the motion on the bases that the plaintiff fails to show a likelihood of success on the merits and/or an irreparable harm.

**The Tortious Interference Claims**

As an initial matter, the Court notes that the parties agreed at the hearing that Massachusetts law governs the tortious interference claim. Pursuant to Massachusetts law, a plaintiff prevails in a tortious interference claim if (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. Harrison v. NetCentric Corp., 433 Mass. 465, 477 (2001). Insofar as the plaintiff claims that Agar and Mr. Posin intentionally induced the remaining Former Employee Defendants to void their employment contracts with USF, there is a viable claim for tortious interference. But as with the conflicting allegations proffered by all parties with respect to the breach of

---

[8]In its memorandum in support of the motion for a preliminary injunction, the plaintiff's counsel cited the clause in the Agreements entitled "Remedies for Breach," in which the Former Employee Defendants appear to have agreed "that any breach of this Agreement ... will cause USF to suffer immediate and irreparable injury, for which there is no adequate remedy at law." The clause was not addressed by counsel during arguments, and the Court does not address the force and effect of such a clause.

contract claims, the Court cannot conclude on the record that there is a likelihood of success on the merits because each of USF's allegations is met with corresponding denials from Agar and the Former Employee Defendants. The classic credibility contest is before the Court, and although it portends great testimony for a jury, it does not afford the Court with an adequate basis to find that USF has met its burden of showing a likelihood of success on the merits of the tortious interference claims.

**CONCLUSION**

  In that there is no showing by the movant of the most critical prong requisite to the issuance of an injunction, i.e., success on the merits, and in other areas fails to establish irreparable harm flowing from incidents in which there might appear to be a likelihood of success on the merits, this Court RECOMMENDS that the District Court DENY the Motion for a Preliminary Injunction by the Plaintiff, U.S. Foodservice, Inc.

| 4/23/04 | /S/ Joyce London Alexander |
|---|---|
| Date | United States Magistrate Judge |

**NOTICE TO THE PARTIES**

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this proposed report and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See* United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980). *See also* Thomas v. Arn, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111, 106 S. Ct. 899, 88 L. Ed. 933 (1986).